# CLAFLIN & Others v. COMMONWEALTH INSURANCE COMPANY.

# SAME v. WESTERN ASSURANCE COMPANY.

# SAME v. FRANKLIN INSURANCE COMPANY.

ALL IN ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF MINNESOTA.

Argued and submitted October 16th, December 17th, 1883.—Decided January 14th, 1884.

*Evidence—Insurance—Jurisdiction—Parties—Removal of Causes—Statutes.*

1. It appearing on examination of the record after argument that the jurisdiction of the court over the cause is in doubt, the court of its own motion took notice of the question and ordered it argued.

2. § 1, ch. 137, act of March 3d, 1875, 18 Stat. 470, confers upon Circuit Courts of the United States original jurisdiction in controversies between citizens of different States, or citizens of a State and foreign States, citizens or subjects, where the matter in dispute exceeds, exclusive of costs, the sum of $500, and further provides as follows: "Nor shall any Circuit or District Court have cognizance of any suit founded on contract in favor of an assignee, unless a suit might have been prosecuted in such court to recover thereon if no assignment had been made, except in cases of promissory notes, negotiable by the law merchant, and bills of exchange." § 2 of that act authorizes the removal of similar causes as to parties and amounts from State courts to Circuit Courts of the United States, but without imposing the restriction as to assignees and assignments. *Held,* That the restriction upon the commencement of suits contained in § 1 does not apply to the removal of suits under § 2.

3. When this court has given a construction to relative provisions in different parts of a statute, and Congress then makes a new enactment respecting the same subject-matter, with provisions in different sections bearing like relations to each other, and without indicating a purpose to vary from that construction, the court is bound to construe the two provisions in the different sections of the new statute in the same sense which, in previous statutes, had uniformly been given to them, and not invent a new application and relation of the two clauses.

4. A policy of insurance against loss by fire contained a clause to the effect that in case of loss the assured should submit to an examination under oath by the agent of the insurer, and that fraud or false swearing should forfeit the policy. The assured, after loss, submitted to such examination, and made false answers under oath respecting the purchase and payment of the goods assured. Although it appeared that the state-

VOL. CX—6

ments were not made for the purpose of deceiving the insurer, but for the purpose of covering up some false statements previously made to other parties: *Held*, That the motive which prompted them was immaterial, since the questions related to the ownership and value of the goods, and were material, and that the attempted fraud was a breach of the condition of the policy and a bar to recovery.

Suits on three policies of insurance made by the several defendants in favor of one Frances E. Barritt on a stock of goods, and by her assigned to one Murphy with consent of defendants after an alleged sale of the goods to him. After loss Murphy assigned to the plaintiffs. The answers set up fraud in procuring insurance on the goods in excess of their value, and in false representations as to their ownership; denied the injury to the amount claimed; set forth that the respective policies required the assured, in case of loss, to submit to examination under oath, and that fraud or attempt at fraud by false statements in such examination should cause a forfeiture of all claims under the policy; and averred that Murphy had been guilty of making such false statements, and that the claims under the policies respectively were forfeited. The plaintiffs were citizens of New York. One of the defendants was a corporation created under the laws of Massachusetts; one a corporation created under the laws of the Dominion of Canada, and one a corporation created under the laws of Missouri.

The suits were begun in a State court of Minnesota, and were removed thence on motion of the defendants to the Circuit Court of the United States for that district. In each case judgment was rendered for the defendant and a writ of error sued out by the plaintiff. The errors assigned referred to the matters set forth in the following extract from the record:

"These causes, having been duly ordered to be tried before the same jury by the court, came on for trial before the Hon. Samuel F. Miller and the Hon. Rensselaer R. Nelson, judges of said court, presiding at said trial, at a general term thereof begun and held at St. Paul, Minnesota, on the third Monday in June, A. D. 1880.

"The respective causes were brought by the plaintiffs on certain policies of insurance bearing date as follows : That of The

Commonwealth Insurance Company of Boston, bearing date of 11th of January, 1877 ; that of The Western Assurance Company of Toronto, Canada, bearing date of 27th of December, 1876 ; and that of The Franklin Insurance Company of St. Louis, bearing date of 29th of December, 1876, the two latter being for $5,000 each, and the former for $2,500, insuring one Frances E. Barritt against loss or damage by fire on her stock of dry goods or other merchandise pertaining to her business, contained in the three-storied store, metal-roofed building, situated No. 37 East 3d street, St. Paul, Minnesota, for a period of three months after their respective dates, with the condition that $35,000 other insurance shall be allowed. The respective policies were assigned by Frances E. Barritt, the assured, to one William Murphy on the 7th day of February, 1877, with the consent and approval of the respective companies.

"On the 25th day of February, 1877, said stock of goods was damaged by fire to the amount of $11,804.72, as found and determined by the arbitrators appointed by the assured and the respective companies. The policy of The Western Assurance Company of Toronto, Canada, contained, among other things, the following provision : 'The assured shall, if required, submit to an examination or examinations under oath by any person appointed by the company, and subscribe thereto when the same is reduced to writing,' and also 'all fraud or attempt at fraud, by false swearing or otherwise, shall forfeit all claim on this company, and be a perpetual bar to any recovery under this policy.'

"That of The Franklin Insurance Company of St. Louis contained, among others, the following provision, viz. : 'And the insured shall, if required, submit to an examination under oath, by the agent or attorney of this company, and answer all questions touching his, her, or their knowledge of anything relating to such loss or damage, or to their claim thereupon, and subscribe such examination, the same being reduced to writing ;' and the further provision, to wit : 'All fraud or false swearing shall cause a forfeiture of all claims on the insurers, and shall be a full bar to all remedies against the insurer on the policy ;' that of the defendant, The Commonwealth Insurance Company of Boston, contained, among others, the following provision, to wit : 'All fraud or attempt at fraud, by false swearing or otherwise, shall cause a forfeiture of all claims on this company under this

policy ; ' and the further provision, viz. : ' The assured shall, if required, submit to an examination or examinations, under oath, by any person appointed by the company, and subscribe to such examinations when reduced to writing.'

"Upon the trial of said causes there was evidence tending to show that the respective defendants required the assured, William Murphy, to appear before their appointed agent and submit to an examination under oath, and answer all questions touching his knowledge of anything relating to such loss or damage and his claim thereupon, and to subscribe such examination, the same being reduced to writing, which the said Murphy did, as required, and that upon said examination the question of the ownership of said goods by said Murphy was made by the defendants, and said Murphy examined at length upon the same, and he answered certain questions relating to the manner in which he paid one Frances E. Barritt, for said stock at the time of his alleged purchase thereof falsely, and there was evidence tending to show that he answered thus with no purpose to deceive and defraud the insurance companies, but for the purpose of showing himself, upon the examination, consistent with a statement that he had made about it a day or two subsequent to the purchase of said stock to R. G. Dunn & Co.'s commercial agency at St. Paul, Minnesota, with a view of obtaining a large commercial credit in eastern cities. There was evidence tending to show that on the 9th day of February, 1877, said William Murphy went to said agency and reported that he had bought the stock of Frances E. Barritt for $35,484.20 ; that he had paid for the same in cash and securities ; and plaintiffs claimed that if the false statements were made to the agents of the insurance company upon examination, even though made upon a material question, without intent to deceive or defraud the insurance companies, it would not prevent a recovery upon the policies, and requested the court upon that point to charge as follows :

"'If you find from the evidence that any incorrect statements made by William Murphy upon his examination were made for the purpose of protecting himself against the statements made by him to the commercial agency for the purpose of obtaining more credit than he was actually entitled to, and not for the purpose of deceiving and defrauding the defendants, then such statements constitute no defence to this action,' and also, 'No false state-

ments made by Murphy on his examination, under oath or otherwise, 'constitute a defence to this action, unless the same were made upon material issues between him and the defendants, and unless you are satisfied from the evidence that Mr. Murphy made them knowingly and wilfully, with intent thereby to deceive and defraud the defendants.'

"The court (his honor Judge Miller addressing the jury) refused to give said instructions, but told the jury in its charge that the said questions relating to the manner in which Mr. Murphy paid said Frances E. Barritt for said stock at the time of his alleged purchase thereof were upon a material point, upon which the defendants had a right to interrogate Mr. Murphy, and were material questions, to which they had a right to true answers from Murphy in said examinations, and upon the point in controversy upon which the said instructions were asked, charged the jury as follows, to wit : 'It is said here, and the point is urged with a good deal of force, that unless Mr. Murphy made these false statements, if they were false, and it is conceded that they were false, with the intent to deceive and defraud these corporations, and if he made them with the intent to deceive and defraud some one else, that it is immaterial to this issue. I don't think that is the law. I don't think it was necessary in order to avoid the policy that the statements by Mr. Murphy should have been made solely, or even partly, with a view to get money wrongfully out of the companies ; however, that is a point I wish to draw your attention to. If these statements had been wholly immaterial, that doctrine may be right ; if it was a matter that the company had no right to inquire into or interrogate him about, if he did swear falsely and intended to deceive some one else, that does not interfere with the policy ; but these companies had a right to have from him the truth about every matter that was material as evidence to show whether he owned these goods or not ; they had a right to have the truth from him, whatever his intentions might have been, that is, as far as the truth was material ; and so far as his testimony before the notary had a tendency to mislead the companies on an important matter, it was false swearing and false testimony within the meaning of the policy, and would avoid the policy. If he stated that which was intended for their action, and which would probably influence their action, and these statements were false, then he swore falsely within the meaning of the

policy, though he didn't intend to cheat them, but intended to cheat somebody else, for, without looking to his motives, the company had a right to an honest statement from him to all questions that went to show whether he was the owner of these goods or not."

" To which refusals to charge as requested, and to said charge as given, plaintiffs' counsel thereupon duly excepted, and, after the rendition of the verdict for the defendants, moved for a new trial on account thereof, and said motion was duly argued by John B. Sanborn, Esq., counsel for the plaintiffs, and Cushman K. Davis, Esq., counsel for the defendants, and after due consideration thereof the court denied the motion, and upon the question as to whether said instructions should be given to the jury as requested, or the jury instructed as in the said charge of the court, the opinions of the said judges were opposed.

" Whereupon, on motion of the plaintiffs H. B. Claflin & Co., by counsel, that the points on which the disagreement hath happened may, during the term, be stated under the direction of the judges, and certified under the seal of the court to the Supreme Court to be finally decided,

" It is ordered that the foregoing state of the evidence and cases, and the questions on which the disagreement of opinion hath happened, which is made under the direction of the judges, be certified according to the request of the plaintiffs, by their counsel, and the law in that case made and provided."

The question raised by the assignment of errors was argued on the 16th of October, 1883, and on the 5th of the following November Mr. Chief Justice Waite announced as follows :

These suits were begun in a State court of Minnesota, by the present plaintiffs in error, citizens of New York, against the several defendants, corporations of Massachusetts, Canada, and Missouri, respectively, upon policies of fire insurance issued to Frances E. Barritt, and by her assigned, with the consent of the companies, to William Murphy. After a loss, Murphy assigned his claims against the several companies under the policies to the plaintiffs. The suits were removed by the defendants to the Circuit Court of the United States for the District of Minnesota. The record shows sufficiently that the

plaintiffs and defendants were citizens of different States, but the citizenship of Murphy, the assignor of the plaintiffs, is nowhere stated. The question is therefore presented, whether the Circuit Court had jurisdiction of the suits. This question was not alluded to by counsel either in their oral or written arguments. As it is one we do not feel authorized to overlook, counsel will be heard upon it either orally, or by printed arguments, as may best suit their convenience, at any time they may desire on or before the third Monday in December next.

Each party then filed a brief on the question of jurisdiction, and the cause was submitted.

*Mr. John B. Sanborn*, and *Mr. W. H. Sanborn*, for plaintiffs in error.

*Mr. George B. Young*, for the several defendants in error.

MR. JUSTICE MATTHEWS delivered the opinion of the court.

These actions were tried in the court below at the same time, before the same jury, and, by stipulation of parties, were heard in this court upon one record, the issues and questions in them respectively being the same.

They were originally commenced in the District Court of the State of Minnesota for the County of Ramsey, the plaintiffs in error being plaintiffs below. The suits were founded on policies of insurance against fire issued by the several defendants upon a stock of dry goods in St. Paul to Frances E. Barritt, who having sold the property insured to William Murphy, assigned to him, for his benefit, the several policies of insurance with the assent of the insurance companies, the defendants. After the loss, Murphy assigned the policies of insurance and his claims under the same, for value, to the plaintiffs in error, who brought suit thereon, February 11th, 1878. On March 7th, 1878, the several defendants filed petitions for the removal of the causes to the Circuit Court of the United States, alleging that the plaintiffs were citizens of the State of New York, and the defendants, respectively, citizens of Massachusetts, or Missouri, or aliens, subjects of Great Britain, in the Dominion of Canada, being corporations created by the laws

of those governments respectively.   The record does not show
anything respecting the citizenship of Murphy, the plaintiffs'
assignor, and it does not appear, therefore, whether, in case
the assignment had not been made, he could have brought suit
upon the policies of insurance against the defendants in the
Circuit Court of the United States.

No question concerning the jurisdiction of that court was
made by counsel, either on the trial or in this court; but, after
having been argued here at the bar on the merits, the doubt
upon the right of the court below to entertain jurisdiction arose
so seriously as in our opinion to require argument upon the
point.   That has now been submitted and considered, the con-
clusion we have reached requiring an affirmance of the juris-
diction.

The question is whether, under the second section of the act
of March 3d, 1875, 18 Stat. 470, a suit of a civil nature, brought
in a State court, where the matter in dispute exceeds the sum
or value of $500, and in which there is a controversy between
citizens of different States, or between citizens of a State and
foreign States, citizens, or subjects, may be removed into the
Circuit Court, which suit, because it is founded on a contract
in favor of an assignee, could not have been brought in the
Circuit Court if no assignment had been made, not being the
case of a promissory note, negotiable by the law merchant, or
of a bill of exchange.   That section of the act is confined to
the subject of removals of suits from the State to the Circuit
Courts, and expressly provides that where there is a contro-
versy between citizens of different States, or between citizens
of a State and aliens, the suit in which it arises may be re-
moved by either party; while the first section, providing that
the Circuit Courts shall have original cognizance of the same
character of cases, concurrent with the courts of the several
States, nevertheless declares that they shall not " have cogni-
zance of any suit founded on contract in favor of an assignee,
unless a suit might have been prosecuted in such court to re-
cover thereon if no assignment had been made, except in cases
of promissory notes negotiable by the law merchant, and bills
of exchange."

The exception out of the jurisdiction, as to suits begun in the Circuit Courts, contained in this clause, does not, by its terms, nor by the immediate context, apply to suits commenced in State courts and afterwards removed to the Circuit Courts; but it is argued that it must apply from the reason and necessity of the case. The ground of this argument is that no reason can be assigned for limiting the jurisdiction in suits first brought in the Circuit Courts, which does not apply equally to those removed into them from State courts; and that if the limitation is not applied to the latter the effect will be thereby to remove it from the former, by enabling parties, forbidden to commence their actions in the Circuit Court, to transfer them at will to that court, after first formally bringing them in a State court. Such, indeed, seems to be the result necessarily to be anticipated from this construction of the act, and the argument, *ab inconvenienti*, must be admitted to be cogent.

An attempt to meet it is made by seeking to limit, by construction, the right of removal given by the second section to both parties, without qualification, to the defendant only in cases where, if exercised by the plaintiff, it would create jurisdiction in the Circuit Court in favor of an assignee whose assignor could not have sued in that court originally. This proposed construction is based upon the words of the clause in the first section of the act which forbids the Circuit Court to take cognizance of any suit founded on contract in favor of an assignee, which, it is argued, may be taken to mean that when the jurisdiction is invoked by the defendant, by a removal from the State court, it cannot be deemed to be exerted in favor of the assignee, but rather in favor of the adverse party. But this, we think, is a refinement upon the language of the clause not justified by its natural import, nor by admitted rules of interpretation. The words "in favor of an assignee" were evidently used, not to distinguish between the plaintiff and the defendant in the suit, but between the assignee and his assignor, so as not to give the favor to the former of bringing a suit which was denied to the latter.

The question, however, we think, is satisfactorily answered by recurring to the state of the law as it existed under the Ju-

diciary Act of 1789, 1 Stat. 78, until the passage of the act of March 3d, 1875.

The 11th section of the Judiciary Act corresponds to the 1st section of the act of 1875, describing in similar terms the character of the suits of which the Circuit Courts should have original cognizance, and containing a similar exception out of that jurisdiction of suits " to recover the contents of any promissory note or other chose in action in favor of an assignee, unless a suit might have been prosecuted in such court to recover the said contents, if no assignment had been made, except in cases of foreign bills of exchange."

The 12th section of the act of 1789 corresponds to the second section of the act of 1875, limiting, however, the right to remove a suit begun in a State court to the defendant alone, where he is an alien, or a citizen of a State other than that where the suit has been brought, and of which the plaintiff is a citizen.

It will be seen, therefore, on a comparison of the two statutes, that the chief differences between them are :

1. That the act of 1875 enlarges the original jurisdiction of Circuit Courts, based on the citizenship of the parties, to all cases of controversy between citizens of different States, and between citizens of a State and aliens, retaining substantially the same exception as to suits upon contracts brought by an assignee, when the assignee could not have sued in the Circuit Court, but not including negotiable paper ; and,

2. That the act of 1875 gives to either party the right of removal from a State court to the Circuit Court, instead of confining it to the defendant.

The exception out of the original jurisdiction, as to assignees of non-negotiable contracts, occupies in both statutes the same relative position, qualifying the provisions of the section in which it is contained, as to suits commenced in the Circuit Court, and not being found in, nor necessarily connected with, that regulating the removal of suits from the State courts.

Under the Judiciary Act of 1789 the question was several times presented to this court for decision, whether the exceptions in the 11th section of the act applied to the right of re-

moval given in the 12th section, and was uniformly answered in the negative. The very question arose directly in *Green* v. *Custard*, 23 How. 484. Mr. Justice Grier, delivering the opinion of the court, said:

"If Green had been a citizen of Texas, and Custard had claimed a right as indorsee of a citizen of Texas to bring his suit in the courts of the United States, because he (Custard) was a citizen of another State, the case would have occurred which is included in the proviso to the 11th section of the act, which restrains the jurisdiction of the court. But the United States court had jurisdiction of this case by virtue of the 12th section. It is a right plainly conferred on Green, a citizen of Massachusetts, when sued by a citizen of Texas in a State court of Texas, no matter what the cause of action may be, provided it demand over five hundred dollars. The exception of the 11th section could have no possible application to the case."

The same conclusion was reached in *Bushnell* v. *Kennedy*, 9 Wall. 387, in which, however, the prior decision in *Green* v. *Custard* does not appear to have been mentioned by counsel or court.

This was the established law at the time of the passage of the act of March 2d, 1867, 14 Stat. 558, known as the Local Prejudice Removal Act, which for the first time conferred upon a plaintiff as well as the defendant the right to remove a suit brought by him in a State court, when the controversy was between a citizen of the State where the suit was brought and a citizen of another State, upon making and filing an affidavit that he had reason to and did believe that, from prejudice or local influence, he would not be able to obtain justice in such State court. The case of the *City of Lexington* v. *Butler*, 14 Wall. 282, was removed by the plaintiff in the action, under this act, from the State court to the Circuit Court. The question of jurisdiction was raised on the ground that the suit, which was founded on interest coupons attached to bonds issued by the city of Lexington and payable to bearer, could not have been brought in the Circuit Court on account of the restriction contained in the 11th section of the Judiciary Act.

It was decided, however, that the case was not within that exception—the holder of such an instrument not being an assignee within the meaning of the act. But the court went further, and, speaking through Mr. Justice Clifford, said:

"Suppose, however, the rule is otherwise, still the objection must be overruled, as the suit was not originally commenced in the Circuit Court. Suits may properly be removed from a State court into the Circuit Court in cases where the jurisdiction of the Circuit Court, if the suit had been originally commenced there, could not have been sustained, as the twelfth section of the Judiciary Act does not contain any such restriction as that contained in the eleventh section of the act defining the original jurisdiction of the Circuit Courts. Since the decision in the case of *Bushnell* v. *Kennedy*, 9 Wall. 387, all doubt upon the subject is removed, as it is there expressly determined that the restriction incorporated in the eleventh section of the Judiciary Act has no application to cases removed into the Circuit Court from a State court, and it is quite clear that the same rule must be applied in the construction of the subsequent acts of Congress extending that privilege to other suitors not embraced in the twelfth section of the Judiciary Act."

By this construction of the act of 1867 it was placed within the power of a plaintiff, on filing the requisite affidavit, to transfer from the State court to the Circuit Court a suit which he could not have commenced in it; the precise objection which is made to the construction now given to the second section of the act of 1875.

It was in contemplation of these previous statutes, and of the judicial decisions construing them, that Congress passed the act of 1875, giving to plaintiffs as well as defendants unrestrained liberty to remove the cases specified in the second section from a State court to a Circuit Court, and we are bound to presume in full view and upon consideration of the very inconveniences which are now relied on as the ground for limiting the right of removal by force of the restrictive clauses in the first section of the act.

In our opinion this is not admissible. We are bound to take

the words of the law in their usual, ordinary, literal meaning, and to construe the two provisions in the different sections in the same sense which, in previous statutes, had uniformly been given to them, and not invent a new application and relation of the two clauses without any indication whatever of any intention on the part of Congress to that effect.

It was, perhaps, with foresight of possible practical inconveniences to result from the extension of the right of removal effected by the act of 1875, and in 'order to furnish means for preventing evasions of the limits of the jurisdiction of the courts of the United States under the forms of the law, that in the fifth section of the act it was provided, that if "it shall appear to the satisfaction of said Circuit Court, at any time after such suit has been brought or removed thereto, that such suit does not really and substantially involve a dispute or controversy properly within the jurisdiction of said Circuit Court, or that the parties to said suit have been improperly or collusively made or joined, either as plaintiffs or defendants, for the purpose of creating a case cognizable or removable under this act, the said Circuit Court shall proceed no further therein, but shall dismiss the suit or remand it to the court from which it was removed, as justice may require." However that may be, we cannot, on the mere ground of a policy of convenience, change the settled rules of construction according to which for so long a period these and similar statutes have been administered.

The question of jurisdiction having been thus answered in the affirmative, it becomes necessary to consider the errors assigned upon the rulings of the court at the trial. These appear from a bill of exceptions and a certificate of division of opinion between the judges before whom the trial was had, and which, to understand the exceptions, it is necessary to set out in full. It is as follows:

[The learned justice here recited the extract from the record quoted above, and continued:]

It was set out in the answer and relied on as a defence that the policy of original insurance made to Frances E. Barritt had been fraudulently procured for her by one Johnson upon false representations, greatly overvaluing the stock insured;

that Murphy received the assignment of the stock and policy with knowledge of the fraud, and that the pretended sale to him by Mrs. Barritt was without consideration and merely colorable and fictitious; that Murphy consequently never acquired or had any insurable interest in the stock and property insured; that after the fire, Murphy, in making proof of loss, stated under oath that the actual cash value of the property insured, at the time of the fire, amounted to $35,491.61, and that same belonged to him; that the property insured was injured to the amount of $26,827.06, and that of said amount $6,463.39 was the cost and value of goods totally destroyed, and $20,360.67 was the amount of the loss on that part of the stock damaged but not destroyed; whereas in truth and in fact the cash value of the goods insured, at the time of the fire, did not exceed $18,000, and the total amount of the loss and damage thereto by fire did not exceed $5,000, and that said goods did not belong to Murphy, as he well knew:

"That thereafter, the said Murphy was examined under oath, at the city of St. Paul, by an agent of the defendant, as provided in said policy, before J. D. O'Brien, Esq., and before R. B. Galusha, Esq., who were then and there respectively notaries public within and for the county of Ramsey, and in such examination the said Murphy did swear that he had purchased said stock from said Barritt, and that he was the sole owner thereof, and that no other person had any interest therein, and that he had fully paid for the same, each and every of which statements as to said purchase, ownership, interest, payment, and the manner thereof, were wholly false, as said Murphy well knew."

It is quite obvious that upon the issues, as made in the pleadings and actually tried, it was material to show what title and interest Murphy had at the time of the loss in the property insured. If he had no insurable interest, that certainly would have been a defence. The object of the provisions in the policies of insurance, requiring the assured to submit himself to an examination under oath, to be reduced to writing, was to enable the company to possess itself of all knowledge, and all information as to other sources and means of knowledge, in

regard to the facts, material to their rights, to enable them to decide upon their obligations, and to protect them against false claims. And every interrogatory that was relevant and pertinent in such an examination was material, in the sense that a true answer to it was of the substance of the obligation of the assured. A false answer as to any matter of fact material to the inquiry, knowingly and wilfully made, with intent to deceive the insurer, would be fraudulent. If it accomplished its result, it would be a fraud effected; if it failed, it would be a fraud attempted. And if the matter were material and the statement false, to the knowledge of the party making it, and wilfully made, the intention to deceive the insurer would be necessarily implied, for the law presumes every man to intend the natural consequences of his acts. No one can be permitted to say, in respect to his own statements upon a material matter, that he did not expect to be believed; and if they are knowingly false, and wilfully made, the fact that they are material is proof of an attempted fraud, because their materiality, in the eye of the law, consists in their tendency to influence the conduct of the party who has an interest in them, and to whom they are addressed. "Fraud," said Mr. Justice Catron, in *Lord* v. *Goddard*, 13 How. 198, "means an intention to deceive." "Where one," said Shipley, Ch. J., in *Hammatt* v. *Emerson*, 27 Maine, 308–326, "has made a false representation, knowing it to be false, the law infers that he did so with an intention to deceive." "If a person tells a falsehood, the natural and obvious consequence of which, if acted on, is injury to another, that is fraud in law." Bosanquet, J., in *Foster* v. *Charles*, 7 Bing. 105; *Polhill* v. *Walter*, 3 Barn. & Ad. 114; *Sleeper* v. *Insurance Company*, 56 N. H. 401; *Leach* v. *Republic Insurance Company*, 58 N. H. 245.

An attempt is made by counsel for the plaintiffs in error to distinguish between matters that are material only as evidence and matters material to the contract and liability of the defendants in error thereunder, and in argument the distinction is illustrated by the following statement:

"Where the question is as to the extent of the loss, and the

assured knowingly exaggerates his loss, and makes false statements concerning the same, his conduct must of necessity be held fraudulent, for he invites the company to take a false position, to assume new and unjust obligations, to pay a loss that has not been sustained and does not exist, to do that which will prejudice and damage the company. But if the assured had made a true statement of his actual loss, and then answered falsely, for personal reasons, as to the parties from whom he had purchased the goods, or the value of those purchased from a certain house, then there could be no fraud, because there could be no prejudice or damage. The questions would be *material as evidence,* but not *material as to the rights and liabilities of the company.*"

But this position is untenable. The fact whether Murphy had an insurable interest in the merchandise covered by the policy was directly in issue between the parties. By the terms of the contract he was bound to answer truly every question put to him that was relevant to that inquiry. His answer to every question pertinent to that point was material, and made so by the contract, and because it was material as evidence; so that every false statement on that subject, knowingly made, was intended to deceive and was fraudulent.

And it does not detract from this conclusion to suppose that the purpose of Murphy in making these false statements was not to deceive and defraud the companies, as is stated in the bill of exceptions and certificate, but for the purpose of preventing an exposure of the false statement previously made to the commercial agency in order to enhance his credit. The meaning of that we take to be simply this: that his motive for repeating the false statements to the insurance companies was to protect his own reputation for veracity, and that he would not have made them but for that cause. But what is that but that he was induced to make statements, known to be false, intended to deceive the insurance companies, lest they might discover, and others through them, the falsity of his previous statements; in other words, that he attempted, by means of a fraud upon the companies, to protect his reputation and credit? In any view, there was a fraud attempted upon the insurers;

and it is not lessened because the motive that induced it was something in addition to the possible injury to them that it might work. The supposition proceeds upon the very ground of the false statement of a material matter, knowingly and wilfully made, with the intent to deceive the defendants in error ; and it is no palliation of the fraud that Murphy did not mean thereby to prejudice them, but merely to promote his own personal interest in a matter not involved in the contract with them. By that contract the companies were entitled to know from him all the circumstances of his purchase of the property insured, including the amount of the price paid and in what manner payment was made ; and false statements, wilfully made under oath, intended to conceal the truth on these points, constituted an attempted fraud by false swearing which was a breach of the conditions of the policy, and constituted a bar to the recovery of the insurance.

Such we understand to be the precise effect of the rulings of the justice presiding at the trial of the case in the court below, in refusing the requests to instruct the jury as asked by the plaintiffs in error, and in giving the instructions contained in the charge excepted to ; and, finding no error in them,

*The judgment is affirmed.*