### VIRGINIA COUPON CASES.

### FAURE *v.* SINKING FUND COM'RS.

*(Circuit Court, E. D. Virginia.* August, 1884.)

1. VIRGINIA COUPONS—"RIDDLEBERGER ACT"—CONSTRUCTION.
 Clause *a* of section 5 of an act of Virginia, called the "Riddleberger act," to "ascertain and declare Virginia's equitable share of the debt created before the partition of her territory," etc., passed February 14, 1882, construed.
2. SAME—REFUNDING COUPONS.
 Coupons maturing after July 1, 1882, held to be fundable, dollar for dollar, in the bonds authorized by the said act, as well as coupons which matured before that date. But the legislature may provide otherwise as to coupons maturing after it so provides.
3. STATUTORY CONSTRUCTION.
 Where any clause of a statute is free from ambiguity, it is not admissible to go out of that clause, and to search in the act at large for provisions which might tend to render ambiguous the plain terms of the clause under interpretation.

This is a petition for a *mandamus.* The case is submitted on printed briefs; that for the sinking-fund commissioners being presented by the attorney general of Virginia. The case was removed into this court from the circuit court of Richmond, and motion is made to remand.

*Leigh R. Page,* for plaintiff.

*F. S. Blair,* Atty. Gen., for defendants.

HUGHES, J. Before the year 1882 the state of Virginia had issued bonds which had assumed four or five different forms. The aggregate amount of all, principal and interest, was about $34,500,000. The principal of the debt represented by these bonds was all created before the late war, while Virginia and West Virginia were one state.

Many of the bonds were still in the form in which they were originally issued. But most of them were in forms issued after the close of the war under acts of the legislature having for their object the funding of long past-due and unpaid interest, and the deduction from the total amount due of such proportion as was supposed to be proper in consequence of the diminution of the state effected by the creation of West Virginia.

The general assembly of Virginia was confronted at its session in 1881–82 with this debt, the principal of which was out of proportion to the resources of the state, and the interest, accrued and accruing on which, was paralyzing to the treasury. That part of this interest which was most embarassing was in the form of the coupons issued upon the consol bonds of 1871, and 10–40 bonds of 1879, which were receivable in payment of all taxes and dues to the state. Possibly the state could have got along with the principal of the debt, if she had not also had to deal with these coupons,—these cut-worms of the revenue,—which had destroyed the school fund, the fund for the support of her eleemosynary institutions, the literary and sinking funds, and had even brought about the necessity of obtaining short loans from the banks for means with which to conduct the ordinary operations of government.

The general assembly of 1881–82 addressed itself to the task of relieving the state from this distressing situation. It devised a proposition of compromise from the state to her creditors in the form of an act of assembly. This act was passed on the fourteenth of February, 1882, and is known popularly as the "Riddleberger act." In substance, the proposition was to strike off one-third of the debt, and to pay the remaining two-thirds of it in bonds running for 50 years, and carrying interest at the rate of 3 per cent. per annum. The details of the act varied the general proposition, notably in respect to the tax-receivable coupons; but the general nature of the scheme of compromise purposed was as has been stated.

Though not very material to the purposes of this decision, the details of the act will be here given. The preamble distinguishes the various sorts of bonds and forms of state debt outstanding on the first of July, 1882, into Classes A, B, C, D, E, F, and Literary Fund, as follows:

DEBT AS EXISTING IN 1882.

| | |
|---|---:|
| Class A, consols, | $14,369,974 |
| Class B, 10-40's, | 8,517,600 |
| Class C, peelers, | 2,394,305 |
| Class D, interest on peelers, | 1,072,545 |
| Class E, unfunded bonds, | 3,773,493 |
| Class F, interest on above, | 2,862,853 |
| Literary fund bonds, | 1,428,245 |
| Literary fund due in money, | 379,270 |
| Total, | $34,798,285 |

NOTE.—These amounts are exclusive of interest "from the preceding semi-annual period of maturity to the date of exchange" on each bond offered for funding, which of course increases somewhat the amounts above stated.

This classification shows the aggregate of the debt, exclusive of certain interest and coupons, to have been nearly $35,000,000. The preamble embodies an argument to show that only about two-thirds of this aggregate of debt was justly due by the state, to-wit, $21,035,377, exclusive of certain coupons. And it declared that the resources of the state are inadequate to pay more than 3 per cent. in annual interest on this debt. The preamble is followed by the enacting clauses of the act, some of them prescribing the form of the new bonds to be issued. These were to bear date as of July 1, 1882; were to run 50 years from date; and were to have attached to them coupons of interest at the rate of 3 per cent. per annum. Section 5 declaring how the several classes of the debt defined in the preamble should be scaled in exchanging the new bonds for the old indebtedness, was as follows:

Sec. 5. The said board of commissioners are authorized to issue such bonds, in denominations of five hundred and one thousand dollars, as may be necessary to carry out the provisions of this act, each denomination to be of different tint: provided, that registered bonds may be issued of any denomination, multiple of one hundred; all registered bonds to be of the same tint: and they are authorized and directed to issue such bonds, registered or coupon, in exchange for the outstanding evidences of debt hereinbefore enumerated, including the bonds held by the literary fund, as follows; that is to say: (a) For her equitable share of Class A, at the rate of fifty-three per centum; that is to say, fifty-three dollars of the bonds authorized under this act, (principal and accrued interest, at par, from the preceding period of maturity to the date of exchange,) are to be given for every one hundred dollars face, principal and accrued interest from the preceding semi-annual period of maturity to the date of exchange of such evidences of debt; and for any interest which may be past due and unpaid upon the same, funded bonds issued under this act may be given dollar for dollar; (b) for her equitable share of Class B, at the rate of sixty per centum, reckoning and accounting for any interest as provided in the case of Class A; (c) for her equitable share of Class C, at the rate of sixty-nine per centum, reckoning any current interest at the date of exchange, as in the cases of Classes A and B, and accounting for the same as provided in Class D; (d) for her equitable share of Class D, at the rate of eighty per centum; (e) for her equitable share of Class E, at the rate of sixty-nine per centum, reckoning any current interest at the date of exchange as in the cases of Classes A, B, and C, and accounting for the same as provided in Class F; (f) for her equitable share of Class F, at the rate of sixty-three per centum; (g) for her equitable share of the bonds of the literary fund, as in the case of Class C; her equitable share of the arrearages of interest (three hundred and seventy-nine thousand two hundred and seventy dollars) to be paid in money.

We have to do in this case only with clause a of the above section 5 of the act, which, as will have been seen, provides that the new bonds are to be exchanged for the old at the rate of 53 cents of the new for the principal of the old, *plus* interest due up to the date of the exchange since the last preceding first day of the half year, and at the rate of dollar for dollar for all coupons ("any interest") which

may be past-due and unpaid at the time of the funding provided for.

The sinking-fund commissioners, in acting under this section of the law, when called upon to fund past-due coupons, do one of two things, namely: (1) If the consol bond is offered with the coupons maturing since July, 1882, attached, they give a new bond, dated July, 1882, at the rate of 53 for 100 as to the bond; and they leave attached to this bond as many non-tax-receivable 3 per cent. coupons as there were 6 per cent. tax-receivable coupons attached to the old bond. By this method of funding they do not, as to the coupons, give dollar for dollar, as the act directs, but they give 3 per cent. coupons for 6 per cent., and that on a principal already scaled down to 53 from 100. They give $26\frac{1}{2}$ cents for a dollar. (2) But if coupons cut from consol bonds are brought, detached from the bonds, they are not funded at all. They, in fact, refuse to fund coupons which have fallen due since July, 1882, on the same terms on which they fund coupons which fell due before that date.

The case at bar arises upon such refusal. The petitioner, John P. Faure, a citizen of New York, on the twenty-sixth day of April, 1884, presented for funding four consol bonds for $100 each, with the coupons attached which matured on the first of July, 1884, and after. He also presented 150 past due coupons, each for $30, detached from consol bonds which had matured in January and July, 1883, and in January, 1884. The commissioners refused to fund these evidences of debt except in the manner that has been indicated. Faure then presented his petition for a writ of *mandamus* to the circuit court of the city of Richmond, praying that a mandate may issue to the members of the board of sinking fund commissioners, commanding them to fund these evidences of debt, dollar for dollar as to the past due coupons, and at the rate of 53 for 100 as to the four bonds and the interest on them from January 1, 1884, to April 26, 1884.

The suit has been regularly removed into this court, and we are asked to grant the writ as prayed for in the petition. The jurisdiction of the court to entertain this proceeding under the judiciary act of congress of March 3, 1875, seems plain. But, independently of that act, an original proceeding by *mandamus*, to try a right, can be brought in a federal court held in Virginia, under section 914, Rev. St., by reason of its use for such purpose in the courts of Virginia. *A fortiori* can such a proceeding be brought here by removal. *Claflin* v. *Insurance Co.*, 110 U. S., 81; S. C. 3 Sup. Ct. Rep. 507.

The only question to be determined is whether the consol coupons which have fallen due since July 1, 1882, are to be funded, dollar for dollar, as the coupons are which fell due before that date. They certainly should be funded on the same terms, if the paragraph of the Riddelberger act, which has been quoted, so declares in unambiguous language. In itself the language is not ambiguous. It assumes that funding may be done at any time in the future. In no section or

clause does the act set a limit to the time within which the holder of bonds and coupons of interest must fund them. The legislature could not have supposed that the funding would all be promptly done shortly after the first of July, 1882. Its requirement that the new bonds should be all dated on that day, did not even imply that the funding should all be done shortly afterwards; for it is the general custom for governments to provide that bonds of any certain class or description shall all bear the same date. As the act did not imply, so it did not expressly provide, that the funding should be done about that time. The act placed no limit in any section of it to this time. It plainly contemplated that funding might be done at any future time, and no one pretends that it may not continue indefinitely until it is put an end to by some future legislation. In speaking of the funding expected to be done in the future, its language giving directions as to the manner in which it should be done, had necessary reference in each case of funding to the day of that particular transaction. If the legislature had intended to discriminate between coupons past due before the first of July, 1882, and those maturing afterwards, nothing could be more certain than that it would have done so in express words. It could and would have added to the paragraph providing for the funding of tax-receivable coupons the words: "But such bonds shall not be given for coupons maturing after the first of July, 1882."

Interest which may be past due and unpaid at the date of the exchange of such evidences of debt, is the phraseology of a section of an act which became law on the fourteenth of February, 1882, and which provided for the funding of $34,500,000 of bonds and interest. The act could not have contemplated that this vast debt could be funded shortly after the first of the approaching July; or that on the debt not funded until various times afterwards, there would be no past due and unpaid interest; or that this interest, when offered for funding at various dates in the future, should not be funded "dollar for dollar" as provided by its own language. The attorney general goes out of the paragraph under consideration into other clauses of the act, and endeavors to gather from the act at large expressions which conflict with the plain and unambiguous tenor of the paragraph itself. He has been unsuccessful in this effort; and he has been unable to show such a contradiction, except by imputing a meaning to these other phrases of the Act which does not necessarily attach to them, and which is not expressed. This method of producing an ambiguity is not legitimate, and is forbidden by the most approved canons of statutory interpretation. We cannot set aside the literal, logical meaning of the unambiguous language employed in one provision of a statute in order to engraft upon it a meaning different from that which its own language imports.

The attorney general contends that the act fixed the amount of the bonds to be funded at $21,035,377; and limited the amount of the

new bonds to that aggregate. But coupons forming part of the $2,013,446 of unpaid past due coupons which have been mentioned are readily funded by the commissioners, and thus this imaginary limit is undergoing daily augmentation. There is no language in the act which fixes the amount of the new bonds at twenty-one millions and a fraction of dollars. On the contrary, the first section of the act directing the creation of the new bonds is elastic in this respect. It empowers and directs the commissioners "to create bonds, registered and coupon, *to such extent as may be necessary to comply with the provisions of this act.*" In a succeeding section, namely section 5, this language is repeated, and the "commissioners are authorized to issue such bonds * * * as may be necessary to carry out the provisions of this act." An act which twice gives a power, unlimited as to amount, in express terms cannot be inferred, from other clauses really not contradictory, to imply that a limit of the amount of the new bonds was intended.

Finally it would have been unjust in the legislature to have made the distinction contended for, and we cannot imply an unjust meaning in an act which does not express that intention. There can be no magical virtue in the date of the first of July, 1882, which converts coupons due before into a more sacred obligation than coupons falling due afterwards. Many of the old bonds are held in England, some of them probably in Holland, and other continental states of Europe; many are held in other states of this union. Comparatively few are held in Virginia. The legislature could not suppose that the funding it provided for would begin before the first of July, 1882, or make much progress until after a considerable lapse of time. The act itself gives no notice to bondholders that they would be prohibited from funding their coupons falling due after the first of July, 1882. On the contrary, it expressly provides, or seems to provide, that whenever the "exchange of evidences of debt" should be made, the unpaid coupons then past due would be funded, dollar for dollar. After thus lulling the distant bondholders into security in this regard, would it be just and equitable for the state now to say that none but unpaid coupons which fell due before July 1, 1882, shall be funded dollar for dollar; and that those which have fallen due since shall be funded only at the rate of $26\frac{1}{2}$ cents on the dollar, and the greater part of them not funded at all.

The *argumentum ab inconvenienti* advanced in behalf of defendants, that if none of the interest on the consol bonds should be funded for the period of 48 years, it will then amount to the great sum of $38,901,312, is inconclusive. In point of fact it shows nothing more than the surprising power of interest to accumulate when left unpaid and allowed to run on for half a century. It can hardly be presumed that the creditors of the state would delay for 48 years the collection or the funding of the interest due them; and, even if they did, the operation of the sinking fund, designed to provide for such an accumula-

tion of debt, would largely neutralize the evil depicted. But, whatever the consequences of the operation of the statute construed by its plain terms, the commissioners of the sinking fund are not thereby justified in virtually enacting an additional section or clause out of their own heads, and ingrafting it by construction into the text of the law. It is competent for the legislature, within some reasonable time, to declare by statute that, after a future date, unpaid and past due coupons detached from consol bonds shall not be funded dollar for dollar, and shall be funded only at the rate of $26\frac{1}{2}$ for 100; but it is certainly premature in the commissioners of the sinking fund, who are not a legislature,—who are but a branch of the executive charged with ministerial powers exclusively,—to perpetrate a measure of legislation, in the form of an arbitrary rule of funding, which, they admit, may involve a difference of millions of dollars in the rights of the state's creditors.

On the whole case we conclude that the motion to remand must be denied and that the *mandamus* must issue as prayed for. Writ granted.

BOND, J., concurred.