## GREAT AMERICAN INS. CO. OF NEW YORK v. RONEY & BERGER CO.*

## NATIONAL FIRE INS. CO. OF HARTFORD, CONN., v. RONEY & BERGER CO., and six other cases.

No. 4296–4303.

Circuit Court of Appeals, Third Circuit.

June 3, 1930.

Rehearing Denied Oct. 13, 1930.

Horace M. Schell, of Philadelphia, Pa., for appellants.

Robert T. McCracken, of Philadelphia, Pa., Butz & Rupp, of Allentown, Pa., and Roberts & Montgomery, of Philadelphia, Pa., for appellees.

Before BUFFINGTON and WOOLLEY, Circuit Judges, and SCHOONMAKER, District Judge.

*Rehearing denied October 13, 1930.

WOOLLEY, Circuit Judge.

The Roney & Berger Company owned and operated a shoe factory in Allentown, Pa. It had placed insurance on buildings, equipment, tools, and stock with nine insurance companies for different sums, which together amounted to $205,000. A fire occurred, resulting in a total loss of all property insured. When the companies refused to pay the insurance money, the Roney & Berger Company sued them in the state court in Lehigh county. For lack of diversity of citizenship one suit was tried there. The remaining eight were removed to the District Court of the United States for the Eastern District of Pennsylvania where, by stipulation, they were tried as one case. The plaintiff had a verdict for a total sum, which was divided by counsel between the several defendant companies, and judgments were entered against them for their allocated amounts respectively. The eight companies appealed and, as the assignments of error are identical, the cases were heard together and treated as one case, of which we shall continue to speak in the singular number.

The factory consisted of a central building—an old structure—with a wing, relatively new, at each end. The entire factory was equipped, as required by the policies, with a sprinkler system, which was operated through the medium of a main supply valve, and at the highest point in the building had a test valve which, when open, permitted the circulation of water in an apparatus on the front of the building, causing a fire alarm bell to ring when the system was in operation. In addition, there was a drain valve.

The story of the fire is, briefly, that on Saturday, January 15, 1927, the factory had, as customary, closed at noon, and every one had left. Early in the evening the engineer returned and banked the fires for the night. He then departed, locking the door behind him and leaving no one in the building. Early in the morning of January 16, a person not connected with the plant saw that the door of the boiler room in the basement was open and observed a small flame not larger than a candle flame. Seeing that it was spreading, he hastened to send in a fire alarm. Although the fire department responded promptly, the fire grew so rapidly that within thirty minutes the roof had fallen in and some of the walls were down. It appears that when the fire was discovered it was burning in the two separate wings of the building, and after it had been extinguished, the main supply valve of the sprinkler system was found closed and the drain valve open, which condition not only prevented the sounding of the alarm bell at the front of the building, but drained the sprinkler system of water and prevented an inflow through the supply valve. The questions involved, as stated by the defendants do not relate to any assignments of error, in respect to failure by the plaintiff to maintain the sprinkler system in working order, as required by the sprinkler clause, and in respect generally to the cause of the fire. We shall therefore assume that, under the court's charge on those issues, which we have voluntarily examined, yet, without discovering error, the jury found that the plaintiff had kept the system in operative condition and that the fire was of incendiary origin.

There are three questions in the case. The first is:

"Was the charge of the court with reference to fraud and false swearing as to the values of the property intended to be insured legally adequate in this regard?"

This question is based on the fraud and misrepresentation clause, identical in all policies, which provides that a policy "shall be void if the insured has concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof; or in case of any fraud or false swearing by the insured touching any matter relating to this insurance or the subject thereof. * * * *"

At the trial the defendants introduced evidence to prove that the plaintiff had concealed or attempted to conceal the sound values of the property by misrepresenting them, and had committed fraud by swearing falsely in regard to them. They did not question the accuracy of the plaintiff's list of insured properties destroyed. Thereupon they presented to the court, as its fifth point for charge, the following:

"If the jury believe that the plaintiff through its duly authorized officers and representatives concealed or attempted to conceal from the defendant material information as to the cause or origin of the fire or as to the value of the insured property upon which claim is made, then your verdict must be for the defendant."

The court, feeling that it had covered the matter in the general charge, refused the point. The defendants assign error in the court's refusal to charge as prayed, and as to the adequacy of the charge as made.

As all the plaintiff's current books had

been burned in the fire, the extent of the properties destroyed and their value as shown by the books were impossible of ascertainment. Therefore both parties were driven to other sources for information with which, the plaintiff, to make a schedule for its statement of claim and to prove loss at the trial and, the defendants, to resist the plaintiff's proofs. Each party had a plan of its own. The plaintiff relied on testimony of its officers, supposedly familiar with the values, and re-enforced and checked their knowledge by duplicate invoices obtained from supply houses; also, on experts and witnesses from machinery manufacturers, manufacturers of lasts, and makers of other supplies, who testified to the sound value of various types of equipment and of the inventory at the date of the fire.

The defendants relied generally on cross-examination of the plaintiff's witnesses, and particularly on a constructive inventory built up by a public accountant on data obtained from various sources, which included, in some instances, the plaintiff's figures of values at earlier dates. There was, in consequence, a running fight on the value of the plant, machinery, lasts, and stock on hand. All this resulted in a mass of evidence greatly confused and sharply conflicting, which disclosed a spread between the plaintiff's total value claim of $239,585.04 and the defendants' proofs of $108,302.39, through which the jury entered with a verdict for $204,416.00, the total of the policies, indicating a loss of true values equal to or more than the amount of the verdict.

Was the charge adequate? We assume, as we must, that it would have been adequate had it included the defendants' point. It did include the substance of it in the instruction on a fraudulent claim, and was to that extent adequate. There was little in the case directly or specifically in respect to violation by the plaintiff of the fraud and misrepresentation clause of the policies by "concealing" values—the only matter to which the defendants' point is now addressed. There was much in the case in respect to the fraud and false swearing provision of the clause—matters not mentioned in the point, though now the main subject discussed in their brief. Yet the learned trial judge not only charged the substance of the point, but went beyond it and charged on the fraud and misrepresentation issue raised by the evidence. In doing so he charged the law properly and submitted to the jury on the divergent evidence of values the real question—whether the plaintiff's claim was, even if contradicted as

to many items, honestly made, or was it fraudulent because of false statements willfully made, supported by false swearing. Insurance Companies v. Weide, 81 U. S. (14 Wall.) 375, 383, 20 L. Ed. 894; 14 R. C. L. 1343. The judge charged all that was required, and could have done nothing more, unless, as we understand the defendants' present position, he should have instructed the jury that, in view of the testimony of the officers of the plaintiff company and of the testimony contradicting them, it was their duty to find that there had been fraud and false swearing as to the values of the property destroyed and that therefore the policies were void. Holding that the issue was not determinable as matter of law and hence not the subject of a directed verdict, there was no error in submitting it to the jury. Camden Fire Ins. Ass'n v. Penick (C. C. A.) 2 F.(2d) 964, 965; Atlas Assurance Co. v. Hurst (C. C. A.) 11 F.(2d) 250; National Fire Ins. Co. v. Renier (C. C. A.) 22 F.(2d) 671.

The one case on which the defendants rely is Claflin v. Insurance Co., 110 U. S. 81, 3 S. Ct. 507, 28 L. Ed. 76. That decision does not rule this case because it is distinguishable on the issue, which was not whether the insured had made a false claim or merely an incorrect claim, but whether the matter with respect to which he made an alleged false statement was material under the forfeiture clause of the policy, and distinguishable on the fact, proved or admitted, that the insured did make a statement with respect to a material matter which was false.

The second question is:

"Whether under the evidence there was any question of fact for the jury of the cessation of the operation of the plant in question; or should the court have passed upon this feature of the case as a matter of law?"

The policies contained a standard clause, entitled "Privileges" clause, permitting the insured "to cease operations for a period of sixty (60) consecutive days" on condition, however, that during that period "one or more watchmen shall be continuously on duty, day and night. * * *" There was no watchman on duty before or at the time of the fire. Immediately there arose the question, vital to the plaintiff's recovery, whether, at the time of the fire, the insured had "ceased operations" in its plant. This became a sharply controverted issue of fact, the defendants maintaining that operations had ceased and the plant was shut down; the plaintiff, that the plant was still in operation.

The facts on which the court submitted the question were briefly these:

The plaintiff's business was seasonal. Twice in every year, according to custom, the factory suspended quantitative operations for a short time for the purpose of making designs and samples for the next season, and for other purposes, among them, the taking of an inventory. This was usually done around the fourth of July and during the Christmas holidays. In this instance, most of the working force had been laid off, some early in December, others about the middle of December, and still others when the inventory was completed on December 23. Throughout the period officers of the company, themselves experienced workmen, and foremen of departments were engaged in making up designs and developing a complete new line of samples for the spring trade. The factory was open all day of every day except Saturday afternoon and Sunday up to the date of the fire. The officers of the company, the office force, foremen of departments, the engineer, and the shipping clerk were there every day; the cutter and a few workmen were there with more or less regularity. Beside making samples, they were doing work on the factory in the way of repairing, painting, and "furbishing up," cleaning and overhauling machinery and shafting, and getting everything ready for the spring season. Making a new line of samples involved operating some machines from time to time. Fire was maintained in the furnace. None of this testimony was contradicted. The defendants, however, produced workmen who testified that practically the whole working force had been laid off without instructions to return.

In view of this evidence, the court, affirming the plaintiff's sixth point for charge, instructed the jury that it was for them to determine as matter of fact whether, under all the circumstances, the plaintiff had ceased operating the plant, saying, by affirming the point:

"And I further instruct you that the word 'operation' does not necessarily mean the running of machinery, but may include any of the other details of factory activity, such as making of samples, shipping of goods, receiving of orders, and posting books, cleaning of machinery and the various many other items which go into the continuity of a going business."

Continuing, it said:

"Now, the evidence in the case is that no watchman was employed, so that you see the pinch of that feature of this defense rests upon this simple question of fact which you must find under all the evidence in this case, whether or not this plant had ceased operations at the time of that fire. Now, when you speak of a plant being in operation, you must take a common sense view of it. It does not mean that the business, manufacturing business carried on there is maintained at the utmost limit of the capacity of the plant. A plant may be in operation without being in full operation. It may be in operation when parts only of what is ordinarily done are done at the time. There may be machines that are not running, but that does not mean that the plant is not in operation, so you have had your attention directed at considerable length to that feature of the case, plaintiff maintaining that that plant was in operation, that work was going on there, that samples were being made up, and that things were being done which kept that plant in operation. Now, you determine that fact."

The defendants charge that the court erred in so affirming the plaintiff's point, and in so further instructing the jury, and particularly in refusing their own fourth point for charge which, after quoting the cessation of operation provision of the "Privileges" clause, reads as follows:

"As the uncontradicted evidence in this case discloses that from the 23rd of December, 1926, to January 17, 1927, the plant had ceased to operate and the plaintiff failed to have one or more watchmen continuously on duty day and night * * * there can be no recovery in this case, as a material warranty of the policy contract has been avoided."

This was, in effect, a prayer for a directed verdict based on a finding by the court as matter of law that the plant had ceased operations.

The law on the subject is clear, and we assume from the absence of an assignment of error on the law that it was properly and satisfactorily charged. The clause covers a contractual undertaking by the insured, based on a valid consideration, which, should the occasion arise, it must perform in order to recover. The question is whether an occasion for performance had arisen, and that question, in turn, depends on whether operations had ceased. If they had not ceased, the risk had not changed, the clause was inoperative, and the law governing it had not been invoked. If they had ceased, the risk had changed, and the clause became operative and was breached. Thus the question became

purely one of fact. Of course, on the uncontradicted facts of some cases of this kind, where no two inferences are possible, courts have, as on other issues, directed verdicts, but when in such cases the facts are open to opposite inferences courts have left the fact inference to be found by the jury. So the question is whether the fixed law applies to the peculiar facts of this case. To aid this court in reaching their respective views counsel for both parties have made encyclopedic citations of cases under the same or like clauses, dealing with all kinds of situations. These decisions are authoritative on their own facts, but not on other facts. Hence, we are constrained to say that no certainty of a correct decision can be had by matching the facts of these many cases with the facts of the case in hand, for they all differ in some particulars which, in the minds of reasonable men, might amount to essential differences. Therefore, looking straight at the facts of this case, we are of opinion that the inferences properly to be drawn from them on the critical question of cessation of operations are peculiarly such as can only be found by a jury, a fact-finding tribunal. The trial court fell into no error when it refused to rule on the facts as matter of law.

### ■ The third question is:

"Should a new trial have been granted by reason of the fact that the jury did not have a copy of the defendants' calculation as to the extent of the loss?"

This question arose from an unfortunate occurrence at the end of the case which was discovered only after verdict, and first came to the attention of the court on motion for a new trial. The best statement of what occurred and how it affected the jury is that of the trial judge in refusing a new trial, to which we refer the litigants, who alone are interested. Briefly, what happened was this: As the case involved many figures concerning the sound value of properties of different kinds, on which the parties had produced widely different testimony, the court suggested and counsel agreed to hand the jury, on retiring, statements of their respective claims as to the loss sustained. The plaintiff submitted its statement, but through a clear mistake of somebody—there is no suggestion of improper conduct—the statement of the defendants, though produced in court, was not given to the jury. Thus the jury had, visually, the figures of the plaintiff and, mentally, those of the defendants. As all group figures were large, odd dollars and cents counted little.

This matter is not here on a valid assignment of error for there is no exception to any action of the judge at the trial, and no appeal from his purely discretionary action on a motion for a new trial will lie. Nevertheless we have, on the defendants' insistence of prejudice, considered the question of our own motion. Yet, in doing this, we realize that we are not in so favorable a position to pass upon the question as was the trial judge who, having heard the case, could sense its effect upon the jury. We are also aware that it is because of that very advantage that the law submits matters such as this to the trial judge to be disposed of entirely within his discretion, and provides that his action shall not be disturbed by an appellate court except when he has abused his discretion. The defendants here on appeal do not, as we understand them, maintain that the trial judge in this instance abused his discretion in refusing a new trial, but urge that, because of prejudice resulting from the absence of their statement from the jury room, this court should in justice set aside the judgments.

The statement is before us. Admittedly it would help the jury to refresh or confirm their recollection of figures. Certainly it contains no figures that were not given the jury by the witnesses. In other words, the paper is not evidence. It is, at most, a brief memorandum of the defendants' minimum values on building, machinery, lasts, etc., reduced finally to six classified figures, totaling the amount of the defendants' calculation, which was stated and restated throughout the trial and repeated by the court to the jury in the last few words of its charge. While the lack of the defendants' statement might, conceivably, have delayed the jury in their deliberations—and of this there is serious doubt—we have not been convinced that it disturbed or prejudiced them in considering and deciding the case. Though regrettable, we cannot find the incident prejudicial.

The judgments are affirmed.