No. 13,027.

Detroit Fire and Marine Insurance Company v. Gagliardi et al.
(32 P. [2d] 832)

Decided March 12, 1934. Rehearing denied April 30, 1934.
Dissenting opinion filed June 2, 1934.

454

Messrs. LINDSEY & LARWILL, Mr. A. W. McHENDRIE, Mr. D. K. WOLFE, JR., for plaintiff in error.

Mr. J. W. HAWLEY, for defendants in error.

*En Banc.*

MR. CHIEF JUSTICE ADAMS delivered the opinion of the court.

ANTONIO Gagliardi and Mike Gagliardi, copartners doing business under the firm name of Gagliardi Brothers, brought action on a fire insurance policy against Detroit Fire and Marine Insurance Company. The cause was tried to a jury and verdict and judgment resulted in favor of plaintiffs. The insurance company prosecutes error.

The partners conducted a general merchandise business in the city of Trinidad, Colorado. Their property, covered by a policy issued by the Detroit company and by other policies in other companies, was destroyed by fire. The policy in question contains the following clause: "This entire policy shall be void if the insured has concealed or misrepresented, in writing or otherwise, any material fact or circumstance concerning this insurance or the subject thereof; or if the interest of the insured in the property be not truly stated herein; or in case of any fraud or false swearing by the insured touching any matter relating to this insurance or the subject thereof, whether before or after a loss."

The insurer claims that after the fire occurred, the insured fraudulently misrepresented the extent of the loss, and that by reason thereof the entire policy is void.

The actual loss at first seemed to be difficult of ascertainment, due to the fact that important firm records were then supposed to have been lost in the fire. The parties therefore adopted the best method they could to ascertain the extent of the property loss as nearly as possible. One plan followed was to procure duplicate invoices from wholesale houses, and deduct therefrom the amount of goods sold as shown by such records as were available. The result, with due allowances for ordinary profits and losses, or as otherwise agreed upon, was considered to approximately represent the actual value of the goods injured or destroyed by the fire. The ascertainment of the volume of sales was greatly aided by the eventual discovery of pads containing sales slips, being duplicates of originals given to customers, such as are commonly used over the counter in ordinary business transactions. The parties proceeded harmoniously in an effort to adjust the loss until events hereinafter related brought a sudden end to the negotiations and the insurer refused to pay anything whatever.

The maelstrom of the dispute centers around Exhibit A, known as "the big red book." Counsel for the insurer, both by brief and oral argument, denounce it unsparingly as a palpable fraud. Many pages of their briefs are devoted to arguments why its delivery by Mike Gagliardi, one of the partners, to the insurance adjusters, renders the policy of insurance void. Exhibit A is a battered and thumbworn book, printed as a ledger, but used generally as a combined ledger and journal. It contains entries extending back for many years prior to the fire. Exhibits 5 and B are also ancient documents; Exhibit 5 is known as "the little red book," and Exhibit B as "the big black book"; both contain ledger and journal entries. The last two named books contribute

to the disagreement of the parties on the merits of the cause, but not to the extent of Exhibit A.

The evidence shows that Exhibit A was an individual record belonging to Antonio and that Mike did not know its contents; that Exhibit 5 was an individual record belonging to Mike, and Exhibit B a record of the firm. The adjusters testified that all of the books were delivered to them on their first visit, but the evidence is conflicting as to when they first saw Exhibit B.

In Exhibit A, "the big red book," Antonio's individual record, the sales are materially exaggerated; this was done before the fire for a purpose foreign to the present inquiry. The record of sales as shown in Exhibit B is more conservative and is claimed by the insured to be in accordance with the facts. Antonio was the bookkeeper of the firm, and Mike, unaware, as he says, of the contents of any book except Exhibit 5 (his own individual record), delivered Exhibit A to the adjusters. Thereafter the adjusters submitted an offer in compromise, but when Mike examined it, it showed what seemed to him to be an excessive amount of sales; he discovered that the sales items were obtained from Exhibit A, refused to be bound by it and declined the offer of compromise. This provoked a controversy whereby Exhibit A became objectionable, not only to the insurer, but also to the insured, which resulted in the withdrawal by the insurer of its offer of compromise, on the ground of alleged fraud. The insurer raises this issue in its answer, wherein it alleges, inter alia, that the insured submitted to the insurer a false and fraudulent sales record, showing a larger amount of daily and monthly sales than the real amount thereof, for the purpose of obtaining more money on the insurance policy than the insured were entitled to recover.

We quote in full (omitting reference to folio numbers) the assignments of error as abbreviated and stated in the abstract by counsel for the insurer: "These as-

signments in substance are that the trial court erred as follows: 1. In denying the motion for directed verdict made at the conclusion of the evidence in chief; 2. In refusing to permit witness Hugh L. Morris to testify as to the reasons why a major portion of the records submitted by Gagliardi Bros. were insufficient or improper as a basis of the alleged claim; 3. In refusing to permit witness Fred L. Henkel to testify as to his opinion of the probable value of the merchandise destroyed by fire; 4. In denying motion for directed verdict made at the conclusion of the evidence; 5. In denying motion for new trial; 6. In giving judgment."

Disregarding technical objections that might be raised to the assignments, we shall treat the first, fourth, fifth and sixth thereof as one, with particular reference to alleged fraud, and follow with mention of the second and third assignments.

Distorted though the entries in Exhibit A are, we see little merit in the objection to this book from the standpoint of the insurer. Its counsel refer to the volume as a *sales* record, and we treat it as such, but the evidence is clear that it was rescued from the debris and delivered to the adjusters inadvertently, by one of the partners without knowledge of its contents, before more accurate records were discovered. The partners took the initiative in seeking to withdraw it from consideration in the computation of the fire loss. Even if this were not so, the book itself in essential particulars seems to be wholly innocuous as far as the rights of the insurer are concerned. Indeed, it would have been decidedly more to the advantage of the insurance company than to the partners to have accepted Exhibit A as a true sales record, for the more the sales account was exaggerated, the greater would be the reduction of goods on hand at the time of the fire. It would not magnify the loss, but would minimize it.

From the above it is manifest that Exhibit A favored

458

the company; that the partners did not defraud nor attempt to defraud the insurer, either expressly or impliedly, but that at first they came close to injuring themselves by unintentionally representing larger sales and consequently a far less loss than they actually suffered. This cannot defeat their recovery in an action on the policy. It would be a red letter day for insurance companies if more people would underestimate their losses. If a mistake occurs, it is subject to correction and the correction was made. *Western Assurance Company v. Bronstein,* 77 Colo. 408, 236 Pac. 1013, is in point. There, the insurance company charged the insured with fraud, the basis of which was that the latter had exaggerated the value of the goods that were saved. On page 410 of the above opinion, Mr. Justice Campbell points out that such exaggeration would redound to the benefit of the insurer and it was there held that such representation does not constitute a fraud. On page 411 of the same opinion it is also held that in order to release the insurer, the false swearing must be as to some material matter, made with the intention of deceiving the insurer and inducing it to pay more insurance than the amount of the loss sustained. Of course there could be no such inducement when the statement of the insured, if false, goes to show that his loss was less than it actually was. Some of the sales figures in Exhibit A, apparently exaggerated, were transcribed for some purpose or other into Exhibit B, and what is said of A in this respect applies as well to B.

It is naively suggested that the unwarranted exaggeration of sales by the firm, as shown in the "big red book," was made for the purpose of misleading an Assyrian, another merchant and prospective purchaser of the store, to impress the latter with the belief that the partners were enjoying a large and prosperous trade. The swollen record of sales, if credence had been given to it and if acted upon, would have been meat to the insurance company but poison to the Assyrian. The latter did not

buy the business, nor do we know that he ever saw Exhibit A, and even if he did, this is not the insurer's responsibility. The third party is not before the court, his interests are not involved, and we need not speculate over his rights. All that this defense amounts to is that a third party had a narrow escape from Antonio's designs in another transaction which was never put into execution. This is wholly remote from the issues and does not absolve the insurer from its liability to the insured.

■ The court did not refuse to allow the witness Hugh L. Morris to testify, as might be supposed from a casual reading of the second assignment. Morris was an accountant of experience; the insurer claims that he was an expert, which the insured denies. He was examined and cross-examined at length, and was given wide latitude. He was permitted to testify as to alterations in records when the alterations were obvious and not disputed. Speaking of some of them, the court finally said: "Well, as far as his examination is concerned, it doesn't show he is any better qualified than the jury is, as far as that is concerned." We cannot tell from the assignments of error what is meant by a "major portion of the exhibits" without counting them and could not tell then which exhibits are meant. If it relates to seven invoices contained in Exhibit G, the witness was asked this question: "In your judgment, are they acceptable as evidence of purchases during the period in question?" The court properly sustained an objection to this question. It was the exclusive province of the court to determine whether the documents were acceptable or admissible in evidence. Furthermore, the exhibits spoke for themselves, they were admitted in evidence and the court told counsel that they could call the attention of the jury to any part of them. We question if the witness was at all familiar with the "major portion of the exhibits." They did not consist of the purchase invoices, concerning which the witness was interrogated, but of

numerous pads containing the sales slips above mentioned. What the testimony of the witness might have been with respect to them is not apparent from the record. For this reason and the other reasons as above stated, the second assignment of error is not well taken.

■ As to the third assignment. Henkel was state agent of the Underwriters Salvage Company of New York. He and Mike estimated the salvage and it was agreed upon by the insurer and insured. It was covered by a salvage inventory admitted in evidence. The insured asked that the witness be allowed to make comparisons from "a careful personal inspection of the debris, and the property that was left from the fire" with the stock of merchandise on hand at the time of the fire, and to give his opinion of the loss from his deductions. The court declined to permit him to testify as to such matters on the ground that it was "pure guess work," which was right. It does not appear that the witness knew or could have known what stock was on hand at the time of the fire and "the debris" if it had any value was covered by the salvage about which there was no question. Such testimony was properly excluded.

■ The insurer charges the partners with other fraudulent manipulations and alterations of books and records with intention to deceive, all of which the partners deny. Every question of fact argued in this court was found adversely to the contentions of the insurer on conflicting evidence. The instructions were so eminently fair that no error is assigned thereon; if faulty in any respect, they favored the insurer; they were unnecessarily repetitious on the question of fraud; they were in part worded from the language of the insurance policy and in part from what the parties seem to agree is the law on the subject. The well known rule applies; we shall not disturb the verdict.

This case has had more than ordinary attention at our hands; all points presented in able and exhaustive briefs

of counsel have been fully considered; the case was argued to this court twice, first in department and afterwards en banc. It is not successfully contended that the verdict of the jury is disproportionate to the actual loss sustained, and we find no error in the record.

Judgment affirmed.

MR. JUSTICE BOUCK and MR. JUSTICE HOLLAND dissent.

MR. JUSTICE BOUCK, dissenting.

From the judgment of affirmance I respectfully dissent for the reasons I now proceed to give.

On the surface this case may well seem to come under the rule that calls for noninterference with a verdict rendered by a jury on conflicting evidence. As a matter of fact, however, it is one of the most striking exceptions to that rule.

On January 18, 1931, a fire swept over the stock of merchandise belonging to Antonio and Mike Gagliardi, who constituted the firm of Gagliardi Brothers, at Trinidad, Colorado. Insurance adjusters arrived on the scene a few days after the fire. They made demand upon the partners for production of the partnership books. Mike accordingly handed them at least two books. One of these was Exhibit A, called "the big red book"; another was Exhibit 5, "the little red book." Exhibit A is now claimed to be a private record of Antonio, whereof Mike says he had no knowledge at all. (Abstract, folio 217.) Exhibit 5 is now claimed to be Mike's private record, kept for Mike's "protection" (folio 222), and of this "little red book" Antonio in turn professes utter ignorance (folio 387). Antonio "was the bookkeeper" (folio 221). "We had so many figures," says Mike, "sometimes he make a mistake, and I put these different pages to see how we come out." (Transcript, original bill of exceptions, page 48, folios 221, 222.)

Due settlement was made under another policy, through

the same adjusters, of claims for the loss on the partners' building.

When the company offered a settlement for the merchandise loss on the basis of the books delivered by Mike in behalf of the partnership as aforesaid, Mike realized, he says, that he had innocently made a mistake in handing it over to the adjusters, and counsel argues that Exhibit A must be ignored on that account. The figures representing partnership sales, he states, were considerably inflated in Exhibit A, which had the effect of reducing the supposed value of the unsold goods and thus threatened to reduce the amount of any recovery. So Mike hunted up another book. He produced one similar to Exhibit A. in size, but quite different in appearance. This third book was Exhibit B, "the big black book," which both partners firmly declare to be the only official partnership record among the three books. These three books are now before this court as a part of the court record herein. Beyond all doubt, the partnership transactions were deliberately distorted in Exhibit A so as to constitute an astounding wholesale misrepresentation of the business in numberless items and in many totals as well, partly by way of inflation, but in various other ways also. Antonio blandly confesses the crookedness and tries to render it harmless in this case by taking full responsibility and saying that it was perpetrated for his own private purposes. The evidence discloses that he showed it to those who were or might be considering the purchase of the partnership business. Among these prospective buyers were an alleged Assyrian late in 1928 or early in 1929, and one Martini in September of 1930. It is obvious that, in the opinion of Antonio, Exhibit A would impress them with the great value of the business and with the salability of the merchandise. (Exhibit A will be further discussed later on as we endeavor to disentangle the troubled web of the story.)

Assuming for the sake of the immediate discussion

that Antonio knew all about Exhibit A, while Mike knew nothing, and that Exhibit A is laid aside for the time being, we are confronted by the question whether with such an assumption the record nevertheless shows affirmatively that the partners are not entitled to their judgment even though they won a verdict from the jury.

In brief the issues presented by the insurance company involved two main propositions.

One of these, which if established necessarily bars the partners from any and all recovery, is that they were guilty of fraud and false swearing under a provision of the policy saying: "This entire policy shall be void * * * in case of any fraud or false swearing by the insured touching any matter relating to this insurance or the subject thereof * * * after a loss."

The other main proposition relied upon for reversal is that the lower court erroneously excluded certain testimony offered by the witness Morris, an expert public accountant, and certain testimony offered by the witness Henkel, an expert fire insurance adjuster.

The verdict is also assailed as being excessive. This point will be considered below, but first I shall deal with the two main propositions above stated, and I shall do so in inverse order.

1. As to whether the trial court erred in rejecting certain of Morris's and Henkel's testimony. The fire that consumed the merchandise in question is claimed to have burned up also all the then and there existing records relating to the partnership business, except the above mentioned Exhibits A ("the big red book"), B ("the big black book"), and 5 ("the little red book"), and Exhibit C (which consists of 60 sales pads, hereinafter described), and a small number of miscellaneous and fragmentary bills, invoices, and receipts. No inventory or other record of the contents or value of the stock, nor any original record of purchases or sales by the partners, is in the court record, except as the exhibits named might

contain them, save that Exhibit 1 is claimed by the partners to be a pencil inventory made about four months before the fire, and that Exhibit 2 is claimed to have been made as a typewritten copy of Exhibit 1. Exhibits 1 and 2 were not produced or mentioned by the partners to the adjusters until after this controversy had arisen, and as to the method of preparing these documents and the intervening custody thereof the partners and their witnesses gave exceedingly contradictory accounts. A certain alleged prospective sale, which is assigned as a reason for preparing the two documents, fell through several months before the fire occurred. As a result of all this, there was nothing definite on which to estimate the value of the stock damaged except crude and altered documents emerging from the possession of the partners, and over 360 alleged invoices (some crude, hard to interpret, and of suspicious appearance, many of them being copies claimed to have come from those who sold goods to the partners), and, last but not least, the amounts of cash and credit sales as culled from Exhibit C (the 60 sales pads) and from Exhibit B ("the big black book"). There was thus before the trial court such a huge and heterogeneous mass of evidentiary material that if it had been a trial to the court without a jury the only reasonable way of handling the case would seem to have been to appoint a referee, or, in the event that the judge himself tried it, by the judge's taking the case under advisement. Numerous peculiarities are present in the exhibits, including countless erasures, alterations, and notations by pen and pencil, as well as ill-formed letters and figures rendering the reading difficult and slow, all raising questions that could not be answered in the limited time allotted to a jury trial before twelve jurors unskilled in such matters and humanly unable to assimilate their meaning without reasonable assistance. It is in such a case as this that an expert finds one of his most legitimate functions, that of affirm-

atively assisting the jury. His task then goes to applying his expert knowledge in interpreting a jumbled mass of documents such as are here before us, or in analyzing an intricate physical situation (like the debris of a fire, as related to value and other relevant issues). In this manner, and this alone, can a rational interpretation be made in this particular kind of case of what to the layman is an unintelligible multitude of single items; and only thus can an understandable picture be presented to the jury. It was too much to expect the jury here to master the details without such assistance. I believe there was an abuse of discretion and prejudicial error in unreasonably restricting counsel's examination of the proffered expert testimony. This of itself should have entitled the company to a new trial if the more important issue of invalidating fraud were not decisive of the case.

2. Coming to the question of fraud and false swearing within the meaning of the provision in the policy, one finds several matters deserving mention. First I revert to the positions taken in arguing for affirmance. It is contended by counsel for the partners that Exhibit A, which is now admitted by everybody to be fraudulent, was handed to the adjusters by mistake, and consequently should not be deemed evidence of wilful misrepresentation; that Exhibit B is the official partnership record submitted to the adjusters as containing truthful entries and representations, and is substantially correct when tested by Exhibit C (the 60 sales pads). This, of course, assumes that Exhibit C is itself correct. It is a broad and basic statement. It therefore behooves us to examine this and other phases of the case with special care in order to find the truth in a disgusting maze of falsehood. Our search reveals nothing but additional fraud.

(a) *The Sales Pads (Exhibit C)*. These are the sort often used by grocers and other merchants. In each new

pad there are 50 original slips, and each original is followed immediately by a duplicate thereof, whereon the entries are made by pressure of the pencil on the original, the back of which bears a carbon surface. The inside back cover is ruled to receive entries of dollars and cents in four columns, headed respectively "cash sales," "charged," "cash sales," and "charged." Each entry is obviously intended to transcribe the individual sale amount from one of the duplicate sales slips left in the pad after the sale, just as each credit entry is to be similarly copied. An entry representing a cash sale naturally would go in regular order into the first or third column; one representing a credit sale would be expected to land in the second or fourth column. Not all sales pads have this inside back cover filled out. In no instance has an individual cash sale been posted there. Though many of the sales are marked "cash" and "paid," there is nothing in the way of a record, whether book, paper, or other document, and not an iota of oral testimony, to show whence came any of the figures in the "cash sales" columns. I shall show that some of these figures are lifted bodily from the admittedly fraudulent document, Exhibit A, in such a manner as to negative the remotest possibility of innocence in doing so. Then again, some of the cash slips, which constitute but a small part of the cash transactions, are listed in a "charged" column in the back, not in a "cash sales" column at all.

It must be remembered that this is not the usual case of conflicting testimony. It involves evidence which is physically before us, offering an independent and unassailable touchstone of truth.

The sales pads (Exhibit C) together with the aforesaid Exhibits A, B and 5, and the numerous other original exhibits are here for our direct and careful inspection, permitting a more thorough examination than could have been accomplished by the respective attorneys, the

jurors, or the trial judge amid the usual exigencies of a jury trial, already referred to. The peculiar complexities and bulk of the evidentiary material in the present case rendered this a more than ordinarily difficult record to digest. The original exhibits all being before us, this court can of course judge of the credibility and weight of this part of the evidence as readily as could any trial court. By using the normal senses of its members, this court can test the strength or weakness of that evidence as if we were ourselves the jury or the trial court. In so doing, of course, it is not for this court to sift the conflicting testimony of the witnesses. We do, however, have both the right and the duty to segregate from the record those portions which represent uncontradicted evidence or admissions of the partners themselves. And we can, and in duty bound must, apply accepted legal principles and rules of evidence to alterations, self-contradictions, and palpable falsities which in a hurried superficial examination by trial judge or jury would unavoidably be overlooked. "Every alteration on the face of a written instrument detracts from its credit, and renders it suspicious; and this suspicion the party claiming under it is ordinarily held bound to remove." 1 Greenleaf on Evidence (16th Ed.), page 701, §564.

(b) *Exhibit B ("The Big Black Book")*. This fails in the supreme test. Instead of being authenticated and supported by the sales pads, as is so earnestly contended on behalf of the partners, it is thoroughly inconsistent therewith. As already shown, the sales pads have no slips at all to correspond with any of the cash-sales entries listed on the inside back covers. We have, however, the evidence palpably before our eyes that what purport to be such "cash sales" entries (compare sales pads 721, 723 and 725) are fraudulent. Corroboration hereof is not lacking. It is now admitted, for instance, that the year dates in Exhibit A have been altered from "1924" to "1926," and so down to "1928," which has

been changed to "1930." Even the naked eye can detect these changes. Moreover, when one employs the aid of a calendar, the names of the weekdays, as given in Italian alongside the days of the month, put this fraud beyond the possibility of a doubt. Now for conclusive proof that the fraud could not be inadvertent mistake. *The fraudulent change of dates just described has been carried, without correcting the resulting discrepancies between weekdays and days of the months, into Exhibit B from Exhibit A for the entire period from May 1, 1929, to December 31, following.* The calendars are conclusive on this point. The old "cash sales" entries, as they appear in Exhibit A, have been bodily transferred in large degree to Exhibit B under a corresponding date just two years later. More than that, such entries from A have been transcribed into B even after the current calendar was substituted in Exhibit B on January 1, 1930, for the fraudulent dating of Exhibit A. It is these stale and obsolete figures which have found their way into the sales pads, set up by counsel as proof of accuracy and good faith in Exhibit B. "Cash sales" entries in pads 723 and 725 are manifestly copied direct from pages 432 and 433 of Exhibit A (actually dating in 1928 but altered to "1930") and then entered into the allegedly immaculate Exhibit B at pages 356 and 357 thereof for the months of February and March, *1930.* Where fraud is so ubiquitous and persistent, truth can no longer abide. This is but one phase of the conclusive proof that Exhibit B is permeated with wholesale fraud, some of it the same kind of fraud as vitiates Exhibit A. It must be remembered that by the testimony of both partners the bookkeeper for both exhibits was Antonio, one of the partners themselves, and that he has made entries in Exhibit B which by comparison with the similar fraudulent entries in Exhibit A stand condemned as hopelessly fraudulent themselves.

(c) *Mike's Innocence as to Exhibit A and Exhibit B.*

It would be hard to understand how, in view of the fraudulent connection of those dates and entries in Exhibit A which were copied into Exhibit B by Antonio, the latter has the boldness to admit that he deliberately altered Exhibit A, except for the fact that the documents would intrinsically refute any denial. But how Antonio can claim to be innocent of wilful fabrication in Exhibit B is beyond comprehension. It is equally hard to understand how Mike's alleged ignorance of Antonio's falsities, even if that ignorance were established, could redound to the benefit of the partnership. What was done by Antonio was no less for or on behalf of the partnership, and bound the partnership no less, than what Mike may have done. Mike's virtue certainly could not offset Antonio's misdeeds. Nevertheless, it is somewhat significant that not only do the exhibits directly tell their own tale of fraud, but they in the same way present indubitable physical evidence of falseness in the testimony, without our having to decide a single conflict in the oral testimony. The exhibits, without more, utterly destroy the testimonial integrity of both partners. Was Mike ignorant of the frauds? Mike denied all knowledge of Exhibit A. He finally admitted on cross-examination that he had made in Exhibit A the entries for December 19 to 24, 1930, inclusive, and put this on the ground of casual inadvertence. Mike persisted in saying and repeating plainly that he wrote these six entries on those very days in December of the year 1930, notwithstanding the now admitted fact that the entries belong to the 1928 account, two years earlier. He emphatically denied any further knowledge of Exhibit A. Yet in over fifty instances his handwriting is easily traced throughout Exhibit A, where his characteristic and invariable spelling of the Italian words for Wednesday and Saturday (Mercordy, Sabbato) contrasts strangely with Antonio's different spelling of those words (Mercoledi, Sabato), as invariable and characteristic for the latter. So likewise

Antonio's testimony that he alone made all the entries in Exhibit A breaks down, discredited, not because we judge as between conflicting evidence, but as the result of this irrefutable documentary evidence before us. Concerning Mike's professed ignorance of Exhibit B, again, we need say no more than that Antonio's uncontradicted testimony, crediting Mike with writing the summary of sales on page 352 thereof, is absolutely proved by our inspection and by comparison with Mike's other admitted handwriting in the record. It does not depend on what we might think of any conflict in the oral testimony. The documentary evidence speaks without the necessity of explanation or qualification by anything that may have happened in the trial below.

(d) *Antonio's Good Faith in Exhibit B.* Inspection of this exhibit at pages 344 to 351, inclusive, and at pages 355 to 366, inclusive, leaves no doubt in one's mind that these entries purporting to give for each month, among other things, the day of the month, with weekday and the cash sales on that particular day, were not made as contended in the regular course of business, each day or every few days; they manifestly were turned out by the penman as a unit and obviously as one operation having at most only a few interruptions. The falsity of it all is easily inferable from this fact, with the further fact that many entries in Exhibit B coincide exactly with entries in Exhibit A bearing the same ostensible dates which are proved *and conceded* to have originally been dated just two years earlier.

(e) *Mike's Little Red Book (Exhibit 5).* The erasures and alterations in this book, made for his "protection," are palpably fabricated in certain respects. It is easily seen that the purported figures here entered indicate also a greater familiarity with the partnership records and affairs than Mike admitted. It contains the figures $11,500.00 as the supposed value of the stock on December 30, 1930, being $2,500.00 less than was claimed

as such in the sworn proof of loss. Here also arise serious questions involving alterations, readily detected by the naked eye.

(f) *The Inventories (Exhibit 1 and Exhibit 2).* Not to speak of self-evident inconsistencies, these inventories are notable as stating the claimed value of the stock on September 15, 1930, as $11,605.83, whereas the sworn proof of loss exceeds these figures by about $2,400.00.

(g) *The Sworn Value of the Stock.* In Exhibit 4 (proof of loss in this case) and again in Exhibit 3 (proof of loss in the companion case, No. 13,103), Mike, in the name of the partnership, stated the value of the entire stock to have been $14,000. In view of the fraud already shown, this difference of about $2,500 has, I think, established for the company the defense of fraud and false swearing, and disentitles the partnership to any recovery whatever.

(h) *The Actual Figures.* So much by way of mere suggestion as to the widespread nature of the fraud and false swearing. Something has been said about the alleged failure of the figures to show that the loss was not less than the amount of the verdict. I call attention to the fact that this is beside the question, as I shall attempt to show briefly under (i) below. When fraud or false swearing is sufficiently proved, there may have been a total loss, yet no right to recover anything whatever would then exist. As a matter of fact, however, the figures in Exhibit B, taken for what they are, do show a substantial shortage in the amounts of the sales, both cash and credit, as measured by the figures in the sales pads (Exhibit C). This improperly magnifies the true value of the stock, thus inflating the loss. By way of illustration, in January, 1931, during the sixteen days recorded in Exhibit B, just preceding the fire, sales pad 356, as checked by the tape of the adding machine, produces the totals of $76.28 for cash sales, and $340.68 for credit sales, or together $416.96, as against the $73.28

cash sales and $294.66 credit sales noted in Exhibit B at page 367, aggregating $367.94. In other words, for the short period of sixteen days Exhibit B thus appears to understate the actual sales by $49.02, or more than 11¾%. In July of 1929, the shortage is $23.69. Again, in October of 1930 there is a shortage of over $120. The aggregate shortages amount to many hundreds of dollars, to say nothing of omissions in Exhibit B on account of the failure to enter items found in the sales pads, and the failure to enter in the back-cover lists certain items represented by the slips. For example, in sales pad 718, the *known* credit shortages, by reason of the failure to transfer items from slips to the back list, from which entries in Exhibit B are supposed to be copied, totaled over $57 in the space of 22 days. Sales pad 721 discloses two "cash sales" columns totaling over $590.00, of which I can find no trace whatever in Exhibit B. On the whole, I am convinced that, from the mere standpoint of the actual figures, the verdict herein was substantially excessive, irrespective of the question of fraud. Among the mysteries of this marvelous record is an item on October 20, 1930, of $1.47 (sales pad 747, slip 38) for an overcoat "sold" to a relative of the partners.

(i) *The Law as to "Fraud or False Swearing" in Fire Insurance Policies.* "A false answer to any material matter, knowingly and wilfully made, with intent to deceive the insurer, would be fraudulent. And if the matter were material and the statement false, to the knowledge of the party making it, and were wilfully made, the intention to deceive the insurer will be conclusively presumed. Where one has made a false representation or statement knowing it to be false, the law infers that he did it with the intention to deceive." Kerr on Ins., page 532; *Claflin v. Commonwealth Ins. Co.,* 110 U. S. 81, 3 Sup. Ct. 507; Ostrander on Fire Ins. (2d Ed.), page 451, §178; 5 Joyce on Ins. (2d Ed.), page 5548, §3339; *Meyer v. Home Ins. Co.,* 127 Wis. 293, 106

N. W. 1087; *Kavooras v. Ins. Co. of Ill.*, 167 Ill. App. 220. The fact that the value of the burned property exceeded the amount of a verdict is then wholly immaterial. *Meyer v. Home Ins. Co., supra.* "There can be no recovery on a policy of insurance issued to several persons jointly, where one of them, in violation of its conditions, made false statements in the proofs of loss upon which the right of recovery is based." Kerr on Ins., 533; see cases there cited. False statements made on sworn examination, or on the trial of the cause, would naturally have the same effect. *Kavooras v. Ins. Co. of Ill., supra.* In my opinion, aside from any question of inflation of the total stock value, the evidence before us shows such a distortion of the truth, including both exaggeration and minimizing of value, that it undoubtedly proves the existence of fraud in this connection.

(j) *Erasures and Alterations in Documents.* It is a well-known and time-honored rule that a document disclosing erasures or alterations is not entitled to be considered as of any probative force until such erasures or alterations are explained by him who offers it. Only then does a question of conflicting evidence arise on that issue. The unexplained changes made in the exhibits before us are legion. When in relation to relevant documents in this case it had appeared that deliberate fraud was attempted even though only against third persons, it became the special care of the court to be alert to see that the fraud did not injure others.

I am convinced that the majority opinion herein is based upon a misapprehension of the proper effect to be given to irrefutable physical evidence such as is before us in this case. The judgment should, in my opinion, be reversed, and I therefore respectfully dissent.

MR. JUSTICE HOLLAND concurs in this opinion.