In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 07-1449 & 07-1577

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ESSIE JACKSON and
JOE JACKSON,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Indiana, South Bend Division
No. 06 CR 32—**Robert L. Miller, Jr.**, *Chief Judge.*

ARGUED JANUARY 25, 2008—DECIDED OCTOBER 14, 2008

Before FLAUM, ROVNER, and SYKES, *Circuit Judges.*

ROVNER, *Circuit Judge.* Defendants-appellants Essie Jackson and Joe Jackson were convicted of mail fraud and conspiring to commit mail fraud along with their co-defendant, Angela Blackwell Jackson, who is not a party to this appeal. They appeal their convictions on a variety of grounds. Finding no merit in any of their challenges, we affirm.

**I.**

The defendants were convicted of engaging in a conspiracy to defraud insurance companies by submitting inflated claims in connection with three different motor vehicles that were stolen or damaged. In each instance, Angela Jackson ("Angela") was the claimant as the owner of the vehicle and the insured. And in each instance, Angela represented that she had purchased the vehicle from Essie Jackson ("Essie") and was still indebted to her for the purchase. Angela married Joe Jackson ("Joe"), Essie's son, during the course of the conspiracy. Joe participated in the scheme by acquiring each of the vehicles in Essie's name; Essie then sold them to Angela. Joe also supplied the receipts in support of a claim for custom rims, tires, and electronic equipment reported damaged or stolen from one of the vehicles.

The first of the three vehicles was a 1999 Ford Expedition sport utility vehicle ("SUV"). Joe Jackson purchased that vehicle on his mother's behalf from Morgan's Auto in Paoli, Indiana. The vehicle had been involved in an accident and was a salvage vehicle. Generally speaking, a salvage vehicle is one that previously has been damaged so extensively that it has been declared a "total loss" for insurance purposes, because the cost of repair is too high in relation to the value of the vehicle—usually around 75% or more of the vehicle's worth—to justify paying for the necessary repairs. Joe paid approximately $6,800 for the Expedition.

Following the purchase, Jeff Lee restored the vehicle with parts purchased by Joe. Lee testified that he was

paid between $3,000 and $4,000 for his work, but that if the repairs had been performed in a body shop, they would have cost about $10,000. Joe testified that he put a total of $13,000 to $14,000 into the restoration of the SUV using money that his mother had given him—presumably, $10,000 for the necessary parts plus the $3,000 to $4,000 that Lee said he was paid for his labor. However, when Lee filled out the Affidavit of Restoration for a Salvage Motor Vehicle that the Indiana Bureau of Motor Vehicles ("BMV") requires for issuance of a new title, he reported using parts worth only about $1,100. Lee testified that the rebuilt Expedition could have been worth between $18,000 and $19,000.

Essie Jackson drove the restored Expedition for one week, and then she agreed to sell the vehicle to her future daughter-in-law, purportedly for the rather substantial price of $33,000. Essie would later testify that this was a non-negotiable, "take it or leave it" price (Tr. 567) that Angela had accepted, making a down payment of $3,000 and agreeing to make monthly payments of $400 thereafter. The purchase price was close to what the Expedition would have been worth as a new and undamaged vehicle. "That was my price," Essie testified. Tr. 588. But Terry Morgan, the salvage dealer who sold the damaged Expedition to Joe Jackson, testified that a restored salvage vehicle is typically worth 35 percent less than a comparable vehicle that was never damaged. Essie and Angela did not enter into a written purchase agreement, and Angela made the monthly payments to Essie in cash. Notably, the application for title that Angela submitted to the Indiana BMV, rather than reflecting a purchase price of $33,000,

indicated that Essie had gifted the car to Angela. Angela insured the car through GoAmerica Auto Insurance ("GoAmerica").

On September 29, 2001, Angela Jackson reported to GoAmerica that the Expedition had been stolen from a Days Inn in Hazlewood, Missouri, near St. Louis. Angela subsequently completed an affidavit of vehicle theft indicating that she had purchased the vehicle from Essie for $33,000, had made a down payment of $3,000, was making monthly payments of $400, and that she still owed Essie $28,000 for the vehicle. In the affidavit, Angela also represented that certain electronic equipment, along with custom rims and tires, had been installed on the vehicle. She claimed a total loss in the amount of $32,750 for the stolen Expedition.

GoAmerica claims adjuster Marc Eichenauer handled Angela's claim for the 1999 Expedition. On investigating the theft of the SUV, Eichenauer learned that it had been a salvage vehicle. Eichenauer subsequently took a recorded statement from Angela in which she disclaimed any knowledge at the time she purchased the vehicle from Essie that it previously had been involved in an accident.

Eichenauer also spoke with Essie Jackson about the Expedition on several occasions. Essie made slightly different statements about the vehicle on each occasion. Essie at first claimed that the Expedition had been pur-chased at auction for $10,500 and was in "great" condition. Tr. 164. When Eichenauer asked her whether she had bought the vehicle as a wreck, she said no, although she

allowed that she had put a lot of money into the vehicle. Eichenauer asked Essie to provide receipts for the work she had done on the SUV along with documentation of the title transfer. But Essie told him that she could give him nothing because all of the paperwork had been inside the Expedition when it was stolen. When Eichenauer spoke with Essie a second time, she said that she had paid between $15,000 and $16,000 for the SUV and had paid additional sums to have it fixed but could not recall how much.

At this point, Eichenauer, his suspicions aroused, turned the claim over to GoAmerica's fraud unit. An attorney for GoAmerica took a sworn statement from Angela on December 13, 2001. In her statement, Angela again repre-sented that she had purchased the Expedition from Essie for a total of $33,000. She again indicated that she had made a down payment of $3,000 on the vehicle and had been making monthly payments to Essie on the remainder. She added that she had made both the down payment and her monthly installment payments in cash, as she did not have a checking account at that time. Angela acknowledged that at the time she acquired the Expedition from Essie, she learned that it previously had been dam-aged. She did not know what Essie had paid for the vehicle. Angela reported that she worked for Liberty Mutual Insurance as a customer service representative and earned approximately $700 for each two-week pay period.

The Expedition was never recovered, and GoAmerica ultimately paid Angela $21,511.25 for the loss, which it

deemed to represent the fair market value of the vehicle. The company paid nothing for the electronic equipment or the custom tires and rims, as Angela lacked the requisite supplemental coverage for such items. Essie Jackson released her lien on the Expedition, and GoAmerica mailed the settlement check to Angela Jackson.

Joe Jackson used the proceeds of this check to purchase a 1999 GMC Suburban on June 13, 2002 at the Greater Kalamazoo (Michigan) Auto Auction. He paid $13,920 in cash for the vehicle, to Azteca Auto Sales. The sales invoice identified Essie Jackson as the purchaser. But Essie immediately re-sold the vehicle to Angela. This time, the two women entered into a form contract memorializing Angela's purchase of the vehicle. That agreement, dated June 13, 2002, reflected that Angela agreed to pay Essie $28,000 for the Suburban with no money down and payments of $250 per month. Essie would later testify that the purchase price was determined by Angela's outstanding debt to her on the stolen Expedition. But the application for title that Angela filed with the Indiana BMV reflected a sales price of only $1,000. Angela insured the vehicle through AAA Insurance ("AAA") on July 25, 2002, and then, nearly nine months later, added specialized coverage for both custom rims and tires as well as aftermarket electronic equipment.

On May 29, 2003, the Suburban was struck and damaged by a vehicle owned by the City of South Bend, Indiana at a location near Essie Jackson's house. There is no contention that the accident was staged or that the reported damage was misrepresented. The damage to the vehicle

prevented it from being driven, so Joe had the vehicle towed down the street and left in Essie Jackson's yard. On the following day, Joe telephoned the South Bend police to report that electronic equipment had been stolen from inside the vehicle. Angela later filed a claim with AAA for the damage to the Suburban's body, including one set of the custom rims and tires, and for the stolen electronic equipment.

The Suburban subsequently was taken to a Chevrolet dealership in South Bend, Gates Chevy World ("Gates Chevrolet"), which was an authorized repair company for AAA, so that the costs of repair could be estimated. Because one of the wheels on the vehicle had been damaged in the collision and required replacement and the electronic equipment had been stolen, and because Angela had purchased specialized coverage to cover those items, AAA required documentation establishing their cost. The manager of the Gates Chevrolet body shop, Dennis J. R. Prenkert, who handled the estimates, advised Joe Jackson to bring in receipts for those items. Joe provided Prenkert with a copy of an invoice from a Performance Plus Tire & Automotive Centers warehouse ("Performance Plus") for the custom rims and tires on the Suburban. The invoice had been altered in the copying process: the phone number of the purchaser had been whited-out, and the (smaller) cash register receipt for the items had been placed on top of the invoice in such a way as to obscure the purchaser's name and contact information on the photocopy. It also turned out that the purchase reflected on the invoice had been made using a stolen Discover Card number. Records

showed that the rims and tires purchased in this transaction had been shipped to Mishawaka, Indiana, a suburb of South Bend. Joe provided two additional receipts from Elmo's Stereo Center for the electronic equipment. One was a receipt that was dated May 15, 2003 (although it appears the year was altered from 2002 to 2003), and was made out to Joe Jackson and reflected a purchase of four television screens for the amount of $4,004; the second was a receipt for the purchase of a DVD player and other equipment dated October 29, 2002, that was made out to Angela Jackson in the amount of $3,280.

Ultimately AAA decided to declare the Suburban a total loss rather than pay for its repair due to the costs associated with the damage to the vehicle and replacement of the electronic equipment reported stolen from its interior. In June 2003, AAA mailed two settlement checks to Angela Jackson: one for the vehicle, including the damaged tire and rim, in the amount of $21,533.49, made out to both Angela and Essie Jackson, and a second check in the amount of $3,500 payable to Angela Jackson only for the electronic equipment. After Essie and Angela each endorsed the first of these checks, and Angela endorsed the second, the proceeds of the two checks were deposited into the joint checking account of Angela and Joe.

Joe Jackson purchased the third vehicle, a 2001 Chevrolet Suburban, on July 14, 2003, from Sunburst Car Company in Arizona. Joe and Angela had found the vehicle on the Internet and decided to buy it, notwithstanding the distance involved, because it was in excellent condition and the listed price was the lowest they had seen. Joe

flew out to Arizona and paid for the vehicle with a cashier's check in the amount of $16,625, using the proceeds of the checks issued by AAA for the GMC Suburban. Once again, Joe purchased the vehicle in Essie Jackson's name. On the same date, Essie sold the vehicle to Angela Jackson, and the two of them entered into a written agreement reflecting a purchase price of $28,000 with no money down and monthly payments of $500. Four days later, on July 18, Essie and Angela Jackson jointly applied for title on the vehicle. Once again, the application for title filed with the Indiana BMV reflected a different purchase price—$16,500—than the one that Angela purportedly had agreed to pay Essie for the vehicle. Angela insured this vehicle with AAA as she had the former, and she renewed her coverage for custom rims, tires, and electronic equipment after spending additional sums to install these items on the vehicle. She later increased the coverage for electronic equipment to $4,500.

On July 4, 2004, Angela reported that the Suburban had been stolen while she was in Chicago attending the fireworks show at the Taste of Chicago food festival. When Angela submitted her proof of loss claim forms for the theft, she included receipts for custom tires and rims and electronic equipment totaling $6,006. She also included a written sales agreement between herself and Essie Jackson for the vehicle dated July 23, 2004—a date nearly three weeks after the vehicle was stolen.

AAA turned the claim over to its fraud investigator, who took a sworn statement from Angela Jackson. When Angela appeared for the statement, she brought with

her a different version of the sales agreement between herself and Essie, this one dated July 14, 2003. Angela explained that when she had entered into the agreement with Essie, she had prepared two original copies of the agreement, one for herself and one for Essie; one of those copies bore the erroneous 2004 date and the other bore the correct 2003 date. In the course of making her statement, Angela stated that she was present to watch the fireworks at the Taste of Chicago on July 4, 2004, and that when she returned to the spot where she had left her car, it was gone. (A U.S. postal inspector would later testify that the Taste of Chicago fireworks show always takes place on July 3 rather than July 4.) Angela identified a receipt from Alltronics in the amount of $6,006.34 as one that she had submitted in support of her claim for the loss of electronic equipment in the vehicle. She identified the signature on the receipt as her own and confirmed that the items listed on the receipt had been purchased on April 18, 2004, and installed on her vehicle at Alltronics. However, subsequent investigation by AAA's fraud investigator and later by a U.S. Postal Inspector would reveal that the Alltronics receipt was counterfeit. The receipt reflected the purchase of electronic equipment that Alltronics did not carry in its store. Moreover, the owner of the store indicated that, according to store records, the receipt number corresponded to a purchase in the amount of $66.78.

Smelling fraud in the air, AAA denied Angela's claim and referred the matter to the authorities. An investigation by the U.S. Postal Inspection Service led the government to conclude that the insurance claims submitted by

Angela Jackson on all three of the vehicles were fraudu-lent. On March 6, 2006, a grand jury indicted Essie Jackson, Angela Jackson, and Joe Jackson. Count One of the indict-ment charged the three defendants with conspiring to commit mail fraud in violation of 18 U.S.C. § 371. Counts Two through Six charged six acts of mail fraud in viola-tion of 18 U.S.C. § 1341 corresponding to various mailings that occurred in connection with the insurance claims.

A jury convicted all three defendants on all counts of the indictment. Essie Jackson was ordered to serve a term of fifteen months in prison. Angela Jackson received a sentence of thirteen months. Joe Jackson was ordered to serve the longest prison term of twenty-four months.

Essie and Joe Jackson appeal their convictions (no objection is raised as to their sentences). Angela has not pursued an appeal.

## II.

### *Essie Jackson*

A.  Sufficiency of Evidence as to Essie Jackson on Count One Conspiracy Charge

Essie Jackson challenges her conviction on the charge that she engaged in a conspiracy with her son and daughter-in-law to commit mail fraud. A conspiracy, of course, is an agreement among two or more persons to engage in a criminal act. *E.g.*, *United States v. Gilmer*, 534 F.3d 696, 701 (7th Cir. 2008). Here, the criminal act was mail fraud, defined as the use of the mails to carry out a

"scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1341. Establishing the offense of mail fraud entails proof that the defendant participated in a scheme to defraud involving one or more material misrepresentations, that she acted with the intent to defraud, and that the mails were used in furtherance of the scheme. *E.g.*, *United States v. Sorich*, 523 F.3d 702, 708 (7th Cir. 2008), *petition for cert. filed* (U.S. Sept. 26, 2008) (No. 08-410); *see also Neder v. United States*, 527 U.S. 1, 25, 119 S. Ct. 1827, 1841 (1999). Proof that a defendant *conspired* to commit mail fraud—an offense distinct from mail fraud itself, *see United States v. Lanas*, 324 F.3d 894, 900 (7th Cir. 2003)—demands proof that there was conspiratorial agreement to commit mail fraud, that the defendant became a member of that conspiracy with the intent to further its aim, and that at least one member of the conspiracy committed an overt act in furtherance of the conspiracy. *E.g.*, *United States v. Sims*, 329 F.3d 937, 943 (7th Cir. 2003). Essie contends that there is inadequate proof that she had any knowledge that a conspiracy to defraud the insurance companies existed. In her view, the jury's verdict could only have been based on conjecture and speculation. In assessing the sufficiency of the evidence, we are of course obliged to view the evidence in the light most favorable to the government, and we will sustain Essie's challenge only if no jury reasonably could have found beyond a reasonable doubt that she was a knowing participant in the conspiracy. *See*, *e.g.*, *United States v. Farris*, 532 F.3d 615, 618 (7th Cir. 2008).

We begin by noting that the evidence was more than sufficient to establish the existence of a conspiracy to

defraud the insurers of the three vehicles. Each of the defendants played a consistent role in the conspiracy: Joe Jackson arranged the acquisition of each of the three vehicles; Essie Jackson was the lienholder and seller (to Angela) of all three vehicles; and Angela Jackson was in each instance the purchaser (from Essie) of the vehicle as well as the insured.

Although the three vehicles differed in their market value, the figure of $28,000 recurred in each of the three sales agreements between Essie and Angela: in the first instance, $28,000 was the outstanding balance that Angela purportedly owed on the 1999 Expedition, and in the second and third instances, $28,000 was the price for which Essie had agreed to sell the 1999 GMC Suburban and 2001 Chevrolet Suburban to Angela.

Yet, the actual cost of the vehicle in all three instances, including in particular the first, was significantly less than $28,000. The Expedition was purchased as a salvage vehicle for $6,800, and was repaired at a likely cost somewhere between the $1,100 worth of parts reported on the BMV restoration form plus the $3,000 to $4,000 that Lee was paid for his work and the $10,000 Lee said a body shop would have charged. Even if the Jacksons had spent $13,000 to $14,000 to restore the vehicle, as Joe Jackson testified, as a salvage vehicle it would never have been worth the $33,000 (close to its original market price as a new vehicle, without the 35% reduction for restored salvage vehicles) that Essie Jackson purportedly charged Angela Jackson for the vehicle. The 1999 GMC Suburban was purchased for $13,920, and yet Essie allegedly sold it

to Angela Jackson for double that amount. The 2001 Chevy Suburban was purchased for $16,600, but again Essie agreed to sell it to Angela for much more than that—$28,000. In short, Essie Jackson was purportedly selling vehicles to Angela for far more than they were actually worth. The notion that the sales price for the second and third vehicles was tied to Angela's indebtedness of $28,000 on the first vehicle is implausible, given that the salvaged 1999 Expedition was never worth that amount, let alone the $33,000 price Essie purportedly charged Angela for the SUV.

Moreover, the Jacksons left a document trail revealing that they reported wildly different values for the vehicles depending on their immediate purpose. Angela Jackson's application for title on the 1999 Ford Expedition reported that Essie Jackson was making a gift of the Expedition to her, which is, to say the least, inconsistent with the notion that Essie was charging her $33,000 for the vehicle. Angela's application for title on the 1999 GMC Suburban reported that Essie had sold that vehicle to her for $1,000. And her application for title on the 2001 Chevrolet Suburban reported that Essie was selling that vehicle to her for $16,500. All three values were much lower than the price the defendants later claimed Essie had sold the vehicles to Angela for: $33,000 for the Ford Expedition, $28,000 for the GMC Suburban, and $28,000 for the Chevrolet Suburban.

There were other signs of fraud as well. Following the theft of the 1999 Expedition, Angela and Essie both made statements evincing an intent to hide the fact that the

Expedition had been a salvage vehicle. The original sales agreement that Angela submitted to her insurer in support of her third claim, for the 2001 Suburban, bore a date that followed the theft of that vehicle by more than two weeks. And, finally, the receipts that Joe and Angela Jackson submitted to support their claim for damage to or theft of the specialized rims, tires, and electronic equipment on the two Suburbans bore multiple and persuasive indicia that they had been doctored to reflect purchases that had not actually occurred.

The evidence was also more than sufficient to establish Essie Jackson's knowing participation in and intent to further this conspiracy. As we have noted, Essie assumed the role of the seller/lienholder of the three vehicles. She was a key co-conspirator in that regard, as it was her purported sales agreements with Angela that the conspirators relied upon to establish the value of the vehicles for insurance purposes. As the seller of each car, Essie signed the title applications and other paperwork attendant to her acquisition of the vehicles and sales to Angela. Those documents, as we have noted, typically assigned a much lower value to the cars (and in the case of the Expedition, the parts used to restore the vehicle) than the price for which she later sold the vehicles to Angela. Essie was also the lienholder on each vehicle (and shared title with Angela on the third). And last but not least, Essie also endorsed the insurance checks that were issued to her on the first two vehicles as the lienholder. The jury could readily and reasonably infer from such evidence that Essie was a knowing participant in the conspiracy.

B.  Due Process

Essie Jackson contends that she was deprived of due process when the government purportedly suppressed evidence relevant to the purchase of the first vehicle, the 1999 Ford Expedition, and otherwise misled the jury as to what the facts revealed concerning her ability to pay for the purchase and restoration of that vehicle. *Cf. Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196-97 (1963) (government violates due process when it suppresses material evidence favorable to accused); *Napue v. Illinois*, 360 U.S. 264, 269, 79 S. Ct. 1173, 1177 (1959) (conviction obtained through evidence known to be false violates due process). Pursuant to Federal Rule of Criminal Procedure 33(b)(1), she requested a second trial on the basis of newly discovered evidence that would have put her ability to pay for the Expedition in a different light, but the district court denied her motion. The decision whether to grant the parties a new trial is one committed to the district court's discretion, *United States v. Woolfolk*, 197 F.3d 900, 904-05 (7th Cir. 1999), and our review of that decision is deferential, *id.* at 904-05.

The parties agree that the Expedition was purchased from Morgan's Auto for a total of $6,800. A down payment of $500 was made via a cashier's check dated April 18, 2000; that check was made payable either to Morgan's Auto or to Joe Jackson. An additional payment in the amount of $2,000 was made by means of a cashier's check dated May 2, 2000, and payable either to Morgan's Auto or to Essie Jackson. A final balance of over $4,000 was paid in cash to Morgan's Auto by Joe Jackson on May 16,

2000. Both Joe and Essie Jackson testified that the money for all three payments came from Essie.

Essie Jackson had bank accounts at both the Teachers Credit Union ("TCU") and the Notre Dame Federal Credit Union ("NDFCU"). At trial, both in cross-examining Essie and in reviewing her bank statements with representatives of the two credit unions, the government sought to establish that she did not have the resources to pay for the Expedition and/or did not pay for that vehicle. Proof along those lines would have bolstered the government's view that Essie was never the true owner of the vehicle and that her sale of the Expedition to Angela was a sham. Essie's NDFCU bank statement from May 2000 readily supported the inference that she did make the second payment of $2,000 for the Expedition on May 2. The statement indicated that on that date, Essie had appeared at the credit union with $2,365 in cash. $2,000 was used to obtain a cashier's check payable to Morgan's Auto, and the remaining $365 was deposited into her account. But the May statements from neither the NDFCU nor the TCU account bore any comparable evidence directly supporting the notion that Essie was the source of the subsequent cash payment of $4,000-plus on May 16. In particular, neither statement reflected withdrawals of $4,000 or more in the weeks preceding that payment. This led to the following dialogue during the government's cross-examination of Essie at trial:

> Q. Okay. Now, you also heard that they [Morgan's Auto] needed another $4,000 in cash right?
>
> A. Yes.

Q. That was your cash?

A. Yeah that was mine.

Q. That was your cash?

A. Yes.

Q. All right. Now we looked at your bank statement
remember, for May 2000. Do you remember look-
ing at that?

                    * * *

A. Yes. Yes.

Q. Okay. And we didn't see $4,000 in cash coming out
of your Notre Dame Credit Union account, did we?

A. No.

Q. And we didn't see that money coming out of your
Teachers Credit Union account either?

A. No.

Q. So that cash you just left—you keep at home?

A. Yes, I do.

Tr. 564-65. Based on the lack of indicia in the May bank
statements that a $4,000-plus withdrawal had been made,
the government was clearly skeptical of the notion that
Essie Jackson could have been the source of the final
payment on the 1999 Expedition.

  Mrs. Jackson contends that the government's case on
this point was misleading by omission, because had her
April 2000 TCU statement been presented to the jury, it
would have been clear that withdrawals from her

accounts in both April and May were sufficient to enable her to make the final cash payment on the Expedition on May 16 as well as the $2,000 payment (via cashier's check) on May 2. She notes that her May statement from TCU reflects total withdrawals of just under $5,700 that month, and her April TCU statement reflects two withdrawals in mid-April totaling over $2,700. Added to the $2,000 cashier's check purchased from NDFCU on May 2, these withdrawals demonstrate that Mrs. Jackson had over $10,000 in proceeds available to her in the weeks preceding the final payment for the Expedition made on May 16. She chastises the government for "suppressing" the April statement and for focusing the jury's attention on her May statements alone.

The fact that the government did not present the April statement to the jury cannot be characterized as the suppression of evidence in violation of its duties under the Due Process Clause. The April statement was one from Essie Jackson's own account, and as such it was as accessible to her as it was to the government. *See United States v. Morris*, 80 F.3d 1151, 1170 (7th Cir. 1996) ("the government will not be found to have suppressed material information if that information also was available to a defendant through the exercise of reasonable diligence") (coll. cases). If she wanted to bring the April withdrawals to the jury's attention, she was free to do so. The government cannot be faulted for not doing so on its own.

In the same vein, the government did not hide exculpatory evidence from the jury when it neglected to have the bank employee who testified concerning the May TCU statement point out that there were withdrawals from

that account in May that, collectively, exceeded $4,000. Those withdrawals were, of course, reflected on the bank statement, and Essie's own counsel could have elicited that information from the bank employee. Indeed, the statement itself was admitted into evidence, and so the jury itself would have seen those withdrawals. Nothing was hidden from the jury. In any case, Essie seemed to indicate in her testimony that the $4,000-plus for the final payment came from cash she kept at home rather than her credit union accounts. Tr. 565. So the notion that any of the bank statements were critical evidence appears to be inconsistent with Essie's own testimony.

In any case, it is doubtful that any of this would have made a difference. Two of the withdrawals that Essie relies on from May took place after the May 16 payment. Moreover, much of the money in these accounts was from rental income on three different homes that Mrs. Jackson owned in South Bend, and Mrs. Jackson used the rental payments to cover the mortgages with little or nothing left to spare. And beyond the rents from her properties, Mrs. Jackson's income was limited. She worked as a housekeeper for Notre Dame University and earned just under fourteen dollars per hour. So the notion that the withdrawals in April and May were available to fund the $4,000-plus cash payment to Morgan's Auto on May 16 is dubious—or, to use the district court's phrase, "extremely speculative." R. 106 at 2. And finally, as we have noted, Essie Jackson herself indicated that the final payment was made from cash she kept at home.

For all of these reasons, the district court did not abuse its discretion in rejecting Essie Jackson's contention that

the government had violated her due process rights and that she was entitled to a new trial.

C.  Ineffective Assistance of Counsel

Essie Jackson contends that she was deprived of the effective assistance of trial counsel, but we may make short work of this argument. She contends that her counsel should have cross-examined a number of the government's witnesses more thoroughly so as to elicit information that would have supported her defense. As to the funds in her bank accounts, for example, she argues that her counsel should have elicited testimony from the TCU representative acknowledging that there had been withdrawals from her TCU account in May that might have funded the May 16 payment on the Expedition. She also suggests that counsel might have gotten GoAmerica's claims adjuster, Marc Eichenauer, who recounted the conflicting statements that she had made concerning what she had paid for the Expedition and the condition it was in, to acknowledge that based on the documents in the company's possession, GoAmerica was well aware that the Expedition had been a salvage vehicle and what she had paid for it. But deciding what questions to ask a prosecution witness on cross-examination is a matter of strategy, *see United States v. Hirschberg*, 988 F.2d 1509, 1513 (7th Cir. 1993); *see also United States v. Smith*, 62 F.3d 1073, 1078 (8th Cir. 1995), and as this is a direct appeal, we have no record as to what counsel's thinking was in opting not to cross-examine these witnesses in the way Mrs. Jackson asserts that he should have. *See Massaro v. United*

*States*, 538 U.S. 500, 504, 123 S. Ct. 1690, 1694 (2003) (noting that raising a claim of ineffective assistance on collateral review is preferable to direct appeal in most instances); *see also*, *e.g.*, *United States v. Cruz-Velasco*, 224 F.3d 654, 664 (7th Cir. 2000); *United States v. Godwin*, 202 F.3d 969, 973 (7th Cir. 2000). In any case, even if we were to leap past this problem and assume that counsel's cross-examination was deficient, Essie has not established a reasonable likelihood that additional cross-examination along the lines she has suggested might have resulted in her acquittal. *Id.* at 973-74.

*Joe Jackson*

D.  Sufficiency of the Evidence as to Mail Fraud Charges
    Count Five

Count Five of the indictment was based on the mailing of the $21,533.49 settlement check from AAA to Angela and Essie Jackson for the damaged 1999 GMC Suburban, which the insurance company had declared a total loss. That settlement included the damage to one of the four sets of specialty tires and rims resulting from the collision with the city vehicle. The cost of the damaged rim and tire was covered by supplemental coverage that Angela Jackson had obtained on the vehicle. And it was Joe Jackson who supplied the photocopied invoice from Performance Plus that was used to establish the value of the rim and tire. This was the only instance in which Joe was directly responsible for a misrepresentation made in support of an insurance claim. Recall that Joe was asked to supply the receipt for the custom tires and rims to

J. R. Prenkert, the manager of the Gates Chevrolet body shop who prepared an estimate on the damage to the vehicle as an agent of AAA. The invoice turned out to have been altered, and the underlying purchase had been made with a stolen credit card number. The invoice also indicated that the rims and tires were purchased in April 2002, although the Suburban was not purchased until June 2002. Joe contends that any representation as to this receipt was immaterial, because there was no dispute that the custom rims and tires were in fact on the Suburban and that one pair of the rims and tires was actually damaged in the collision. Under the terms of Angela Jackson's custom equipment coverage on the car, AAA was obliged to compensate her either for the cash value of the damaged rim and tire or the cost of repair or replacement, whichever was less. Consequently, he reasons, the insurance company was obliged to reimburse his wife for the cash value of the damaged items, regardless of the fraudulent nature of the receipt he presented to Prenkert and any representation by him as to where he purchased the rims and tires or what he paid for them.

But the jury reasonably could have found that the receipt was material in the sense that it had a "natural tendency to influence, or [was] capable of influencing" AAA in its decision to reimburse Angela Jackson pursuant to the insurance policy. *Neder v. United States*, *supra*, 527 U.S. at 16, 119 S. Ct. at 1837 (internal quotation marks and citations omitted); *United States v. Henningsen*, 387 F.3d 585, 589 (7th Cir. 2004) ("A false statement is material [for purposes of a mail fraud charge] if it has 'a natural tendency to influence, or is capable of influencing,

the decision of the decisionmaking body to which it is addressed.'") (quoting *United States v. Fernandez*, 282 F.3d 500, 508 (7th Cir. 2002)). The undisputed testimony at trial was that AAA would reimburse the insured for items covered under specialized coverage only upon verification of the cost of the lost or damaged items. Tr. 492. That is why Prenkert demanded a receipt for the damaged custom rim and tire from Joe Jackson. And Prenkert testified that he relied on the receipt that Joe provided in preparing the damage estimate for the vehicle. (He divided the total reported cost of the rims and tires by four and reported the resulting figure as the estimated value of the damaged rim and tire.) Even if, as Joe suggests, the Jacksons' cost in acquiring the rims and tires was not dispositive of the amount AAA was required to pay under the specialized coverage, the receipt could still be viewed as material. An insurer may reasonably insist on a receipt and rely on that receipt for any of several reasons: as one source, if not the exclusive source, of information as to the value of the damaged or stolen item, to establish the insured's legitimate possession of the item (to confirm that it was not stolen from someone else, for example—see the cases cited *infra* at 31-32), and to document the nature and authenticity of the item (all that glitters is not gold). *Cf. United States v. Chandler*, 752 F.2d 1148, 1151 (6th Cir. 1985) (18 U.S.C. § 1001 false statement case) (altered receipt was the type of false statement that could have a tendency to affect tax determination, and thus was material, even if it did not actually affect IRS's decision). This is particularly true as to specialized coverage, which by its nature is designed to insure items that are not de rigeur on automobiles.

Counts Two, Three, and Four

The mail fraud charges set forth in Counts Two, Three, and Four all were based on mailings related to the insurance claim that Angela submitted to GoAmerica for the stolen 1999 Ford Expedition. Joe Jackson did not himself make any of the fraudulent misrepresentations concerning that vehicle. Even so, co-schemers are jointly responsible for one another's acts in furtherance of the scheme; so upon finding that Joe was a knowing participant in the scheme, the jury was free to hold him to account for any fraudulent misrepresentations that were made by Essie and/or Angela after he joined the scheme. S*ee United States v. Adeniji*, 221 F.3d 1020, 1026 (7th Cir. 2000) (citing, among other authorities, *United States v. Wilson*, 506 F.2d 1252, 1257 (7th Cir. 1974)); *see also Pinkerton v. United States*, 328 U.S. 640, 646-47, 66 S. Ct. 1180, 1183-84 (1946) (participant in conspiracy is liable for foreseeable acts of his co-conspirators in furtherance of conspiracy); *United States v. Macey*, 8 F.3d 462, 468 (7th Cir. 1993) ("In a mail fraud case, a defendant is liable for the acts of his co-conspirator even if the indictment did not charge conspiracy."). Jackson does not dispute that point, but as with Count Five, he maintains that the evidence was insufficient to establish that any of his co-defendants' misrepresentations were material.

The misrepresentations concerning the Expedition had to do with the price that Essie Jackson paid for the Expedition and the condition that the vehicle was in when she acquired it. Marc Eichenauer, GoAmerica's representative, testified that the condition of the vehicle factors into the

claims adjustment process as a measure of what the insurer owes the insured for the vehicle; and the purchase price of the vehicle is in turn something that the insurer takes into account as an indicator of what condition the vehicle was in when acquired. But as Joe points out, Eichenauer went on to note that GoAmerica also relies on published information on the value of used cars to assess the worth of a vehicle which previously had been damaged and declared a loss, and that GoAmerica had done precisely that with the Expedition:

> I believe, in this particular case, we looked at used-car guides to come up with a value and used the loan value on this particular vehicle, and that's a value that we use in cases where the vehicle had been a total loss before. So even though there were some questions that we didn't get answered on the claim, we did know that the vehicle had, in fact, been in an accident before, and, therefore, we didn't rate it at retail value.

Tr. 170. Based on this testimony, Joe argues that any representations Essie or Angela Jackson made to GoAmerica concerning the condition and price paid for the Expedition could not have been material, because GoAmerica was aware of the prior history of the vehicle and ultimately relied on publicly available data about the value of the vehicle rather than on anything the Jacksons told the company about its worth.

But here again Joe exhibits an unduly narrow view of materiality. That GoAmerica ultimately did not actually rely on the defendants' representations as to the value

and condition of the vehicle does not render their statements immaterial. *Neder*, 527 U.S. at 24-25, 119 S. Ct. at 1841; *see also United States v. Rosby*, 454 F.3d 670, 674 (7th Cir.) ("Reliance is not . . . an ordinary element of federal criminal statutes dealing with fraud. *Neder* so holds for § 1341 in particular."), *cert. denied*, 127 S. Ct. 607 (2006); *United States v. Reynolds*, 189 F.3d 521, 525 (7th Cir. 1999) (charge of bank fraud pursuant to 18 U.S.C. § 1344) ("A statement is material if it would be capable of influencing the decisionmaker's decision; . . . there is no requirement that the statement must in fact influence the decisionmaker (that would be reliance)."). Joe does not dispute that the purchase price and condition of the insured vehicle are highly material to the insurer. It is unsurprising that insurers like GoAmerica routinely will look first to the insured for information on such subjects: the insured is in the best position to know what he paid for the vehicle and what condition the vehicle was in when he bought it. Nor is it surprising that when the insurer receives conflicting or otherwise suspicious information, as GoAmerica did from Angela and Essie Jackson, it will look elsewhere for more reliable information about the true value of the vehicle. The fact that GoAmerica ultimately relied on used-car guides to assess the value of the Expedition does not detract from the materiality of the fraudulent statements that Essie and Angela made about the acquisition of the Expedition. Those were statements that the Jacksons hoped would deceive GoAmerica into paying nearly full retail price on a salvaged vehicle, they were statements on material subjects that insurers routinely take into account in the claims process, and they

were statements upon which the insurer might have relied to its detriment had the Jacksons been more adept at covering their tracks.


Count Seven

The mail fraud charge set forth in Count Seven was founded on the vehicle theft claim form and supporting document that Angela Jackson sent to AAA in connection with the 2001 Chevrolet Suburban. Included among the documentation was Angela Jackson's proof of loss affidavit, which averred that she had purchased the Suburban from Essie Jackson for $28,000, a purchase agreement between Angela and Essie Jackson reflecting the same purchase price, and a receipt from Alltronics for electronic equipment that allegedly was in the Suburban at the time of the theft. The $28,000 purchase price reported on the affidavit and purchase agreement was inconsistent with the $16,650 that Joe Jackson paid to the Arizona car dealership for the Suburban and the $16,500 reported to the Indiana BMV when Angela and Essie Jackson jointly applied for a title to the Suburban; the date of the purchase agreement between Angela and Essie Jackson was July 23, 2004, several weeks after the Suburban was reportedly stolen; and the Alltronics receipt was not genuine in that it reflected the purchase of electronic equipment that an Alltronics employee would testify was not carried by Alltronics.

Although AAA was not deceived by these representations (they paid nothing on the claim for the 2001 Chevy Suburban), they were material nonetheless. Again, an

insurance company looks first to the insured for information about a stolen vehicle, and information that the insured provides about the price she paid for the vehicle helps the insurer gauge the condition and value of the vehicle. Likewise, as we have discussed, it is routine for insurance companies to insist on receipts for electronic and other items insured through supplemental coverage; insurers look to such receipts for confirmation that the items were genuine and actually were in or on the stolen vehicle. That an insurer may not ultimately rely (or rely exclusively) on such information does not render them immaterial.

E.  Evidence concerning commission of credit card fraud in the purchase of the custom tires and rims

As discussed, following the collision that damaged the 1999 GMC Suburban and one of the custom tires and rims on the vehicle, Joe Jackson submitted a receipt reflecting the purchase of a set of four custom rims and tires in April 2002 from Performance Plus for just over $4,000. The rims and tires had been purchased over the telephone from a Performance Plus warehouse in Long Beach, California using a Discover Card. And it turned out that these items had been purchased using a stolen credit card number. A field investigation manager for Discover Financial Services, David Ostertag, testified that the purchase had been made without the knowledge of the credit card holder, who lived in Florida. When the card holder reported the unauthorized charge, Discover had looked into the matter and determined that someone had

managed to have the address associated with the card changed just before this purchase was made; the custom rims and tires were then shipped to the new address, which was located in Mishawaka, Indiana, a South Bend suburb. Ostertag recounted all of this for the jury and his written report, which reflected his determination that the purchase of the tires and rims was fraudulent, was admitted into evidence over Joe Jackson's objection.

Joe, by the way, later testified that he did not purchase the custom tires and rims directly from Performance Plus. Instead, according to his account, he purchased them on the street from a woman unknown to him who happened to drive by his home while he was outside washing the Suburban. She offered to sell him the tires and rims, he agreed to pay her $4,000 in cash for the items, and she provided him with a copy of the Performance Plus invoice and receipt, after deleting or obscuring personal information on the invoice that she did not want him to have.

Joe contends that the prejudicial impact of Ostertag's testimony and report outweighed its probative value and that the district court should have sustained his objection and excluded the report pursuant to Federal Rule of Evidence 403. (In a footnote, he suggest that Ostertag's testimony "may have" violated Rules 404(b) and 702, and that admission of Ostertag's report may also have run afoul of Rule 608(b). But he did not object on these grounds below, and his mere mention of these rules is insufficient to require our attention. *E.g.*, *United States v. Acosta*, 534 F.3d 574, 590 (7th Cir. 2008).) Joe reasons that although

he was not charged with defrauding the credit card company, and the government conceded it had no proof that he committed credit card fraud, Ostertag's testimony and report implicated him in the fraud against Discover and likely tainted the jury's assessment of his guilt on Count Five, if not all of the charges. We review the district court's decision to admit this evidence for abuse of discretion. *E.g.*, *United States v. Samuels*, 521 F.3d 804, 813 (7th Cir. 2008).

Like the district court, we agree that this evidence was prejudicial to Joe, but we cannot say that it was so lacking in probative worth as to render it inadmissible under Rule 403. Joe had presented the Performance Plus invoice as proof of the identity and cost of the custom rims and tires that he and his wife had acquired and installed on the GMC Suburban. A jury could reasonably view the facts underlying the purchase memorialized in that invoice as relevant in assessing his intent to defraud the insurer. That the tires and rims were obtained by fraud—whether or not the fraud was committed by Joe himself—makes it more likely that he and his co-defendants, in demanding compensation for the damaged rim and tire, were seeking compensation for a loss that they had not actually incurred. The jury was not required to believe Joe's story that he had innocently paid $4,000 in cash for the tires and rims to a stranger who happened by his house and offered them for sale; the jury reasonably could have inferred that he was involved in their fraudulent purchase from Performance Plus. This was not collateral evidence, but evidence that the Jacksons had not legitimately acquired the items for which they were now seeking recompense. *See Claflin v.*

*Commonwealth Ins. Co. of Boston*, 110 U.S. 81, 94-97, 3 S. Ct. 507, 514-16 (1884) (false statements concerning purchase of insured property were material to extent they related to whether insured actually had insurable interest in property); *Wagnon v. State Farm Fire & Cas. Co.*, 146 F.3d 764, 769 (10th Cir. 1998) (same); *cf. Level 3 Communications, Inc. v. Fed. Ins. Co.*, 272 F.3d 908, 911 (7th Cir. 2001) (insured incurs no loss for which it is entitled to compensation when it is compelled to return property that was stolen).

F.   Admission of Mr. Jackson's prior conviction

Joe Jackson testified in his own defense. Pursuant to Federal Rule of Evidence 609(a)(1), the district court permitted the government to introduce evidence that in 1996 he had been convicted of receiving stolen property.[1] At the time of the trial, the conviction was just a few weeks shy of being ten years old. Had the conviction been more than ten years old, of course, it would have been presumptively inadmissible under subsection (b) of Rule 609 absent a finding by the district court that its probative worth substantially outweighed its potential for prejudice so as to warrant its admission in the interest of justice. *See*, *e.g.*, *United States v. Rogers*, — F.3d —, 2008 WL 4072542, at *3 (7th Cir. Sept. 4, 2008). But the conviction was not yet ten years old, and so there was no presumption against its admission. The district judge,

---

[1] After the court overruled Joe Jackson's objection to this evidence, his counsel elicited this information himself on direct examination.

weighing each of the pertinent factors identified by this court in *United States v. Mahone*, 537 F.2d 922, 929 (7th Cir. 1976) (citing *Gordon v. United States*, 383 F.2d 936, 940 (D.C. Cir. 1967) (Burger, J.)), found that the probative worth of the conviction vis-à-vis Mr. Jackson's truthfulness exceeded its potential for prejudice. Tr. 597-99. Joe contends that the court abused its discretion in permitting the evidence over his objection, given the age of the conviction and the likelihood that the jury may have surmised from the conviction that he was the probable perpetrator of the credit card fraud in the purchase of custom tires and rims from Performance Plus. Once again, we review the district court's decision for abuse of discretion. *United States v. Hernandez*, 106 F.3d 737, 740 (7th Cir. 1997).

The court did not abuse its discretion in allowing this evidence. Although the conviction was close to ten years old, it was not yet at that mark and consequently under the terms of Rule 609 there was no presumption against its admission. Any perception of arbitrariness in that regard is the inevitable result of a rule that conditions the admissibility of evidence on its age. As it was, the court weighed the age of Joe's conviction as a factor *against* admission. Tr. 598. As for the probative value of the conviction, the court reasonably concluded it reflected conduct that did bear on Joe 's truthfulness, *see Varhol v. Nat'l R.R. Passenger Corp.*, 909 F.2d 1557, 1567 (7th Cir. 1990) (en banc) (receipt and use of stolen property sufficiently probative of witness's credibility to permit cross-examination about such conduct pursuant to Rule 608(b)), although the crime of receiving stolen property is not a crime of dishonesty per se, *see id.* The court also noted that

the nature of the charges rendered Joe's intent and state of mind central issues in the case; and his credibility as a witness would be a key factor in assessing his testimony as to those issues. We have no reason to question that assessment, and although we agree with Joe that the evidence held some potential to prejudice him, we cannot say that the possibility was so strong as to compel the exclusion of this evidence. In that regard, we note that the district court gave the standard instruction admonishing jurors that they were to consider the conviction solely in evaluating Joe Jackson's truthfulness as a witness and for no other purpose. Tr. 699-700. That instruction, which we presume that the jury followed, *e.g.*, *United States v. Jackson*, 540 F.3d 578, 598 (7th Cir. 2008), mitigated the prejudicial impact of the testimony concerning the conviction, *United States v. Montgomery*, 390 F.3d 1013, 1016 (7th Cir. 2004) (citing *United States v. Nururdin*, 8 F.3d 1187, 1192 (7th Cir. 1993)).

### G.   Mr. Jackson's Rule 33 Motion for New Trial

Pursuant to Federal Rule of Criminal Procedure 33(b)(1), Joe asked the district court to grant him a new trial based on newly discovered evidence. The evidence in question related to Count Six of the indictment. That count, as we have discussed, related to the claim that Angela Jackson submitted for electronic equipment that had been stolen from the 1999 GMC Suburban—namely, a video player and multiple television display screens for the use of passengers. In support of that claim, Joe had submitted two different receipts from Elmo's Stereo Center in

South Bend: the first, which became Government Exhibit 14A, reflecting the purchase of four television screens on May 15, 2003 for $4,004, and the second, which became Government Exhibit 14B, reflecting the purchase of a DVD player and related equipment on October 29, 2002, for $3,280.

It was the testimony concerning Exhibit 14B on which Joe would later focus his motion for a new trial. At trial, Alan Vernasco, the owner of Elmo's, testified that he had not sold the DVD player and other equipment listed on the receipt to Angela Jackson. Vernasco said that he had searched his records and could find no evidence of such a sale. He explained that the receipt the Jacksons had tendered was just an estimate prepared after the theft on the basis of the Jacksons' representations to him about what they had purportedly purchased. Following his conviction, Joe contacted Gates Chevrolet to inquire whether it had any record of a purchase from Elmo's on the Jacksons' behalf. Gates's comptroller would later prepare a letter and declaration to the effect that although Gates could not locate a copy of an invoice from Elmo's, it had discovered evidence confirming a purchase by Gates in the amount of $3,280 from Elmo's in January 2003 on the Jacksons' behalf for a 1995 Chevrolet Blazer.[2] (We shall have more to say about the Blazer in a

---

[2] The comptroller referred to the vehicle as a Chevrolet "[p]ickup" rather than a Blazer (R. 127, Murray Affidavit ¶ 4), but there appears to be no dispute that he was referring to a Blazer SUV.

moment.) During the trial, J. R. Prenkert, the Gates Chevrolet body shop manager, had conceded the possibility that the replacement electronic equipment purchased for the Blazer could have been installed on the 1999 GMC Suburban instead. Jackson contended that the belatedly-discovered proof of Gates' $3,280 purchase from Elmo's gave lie to Vernasco's insistence that no such purchase had been made: either his records were incomplete, or he had only searched for proof of a sale to Angela Jackson directly rather than to (or through) Gates Chevrolet.

The district court agreed that this was newly discovered evidence, that Joe could not have discovered it previously, and that it was material in the sense that the jury could have concluded that the Elmo's receipt or estimate the Jacksons had submitted to AAA reflected the actual purchase of the equipment listed. R. 146 at 12-13. Still, the court was unconvinced that the evidence likely would have made a difference to the outcome of the trial. *Id.* at 13-14. The court reasoned that the evidence related only to a discrete piece of the government's case against Joe and did nothing to undermine the abundant other evidence of his guilt. *Id.*

We review the court's ruling on the motion for abuse of discretion, *United States v. Gillaum*, 372 F.3d 848, 857 (7th Cir. 2004), and we have no reason to quarrel with the court's assessment that the new evidence would not have made a difference to the outcome of the trial. The evidence related to one count, and to only one of the two receipts underlying the mail fraud charge in that count. Joe has given us no reason to believe that even if the jury was

persuaded that Exhibit 14B reflected an actual purchase, contrary to Vernasco's testimony, that it likely would have acquitted him on Count Six, let alone any other charge.

And the notion that the Gates evidence proved the authenticity of Exhibit 14B as proof of what was stolen from the 1999 GMC Suburban requires a series of leaps that Joe has failed to address in his brief. As the Gates comptroller's letter and affidavit reveal, the $3,280 worth of equipment that Gates obtained from Elmo's was purchased not for the 1999 GMC Suburban, but the 1995 Chevrolet Blazer. It turns out that in October 2002, the Jacksons had had the Blazer towed to Gates Chevrolet in order to repair damage that occurred incurred in a hit-and-run collision in front of their home. While the pickup was stored in the Gates lot, it was broken into and the electronic equipment inside (including a CD/DVD player and television display screens) was stolen. That theft led to the order of replacement equipment from Elmo's through Gates. Prenkert, as we have noted, conceded that this equipment could have been installed in the Suburban instead of the Blazer, although he could not recall whether this is what had occurred. So the evidence requires the leap that specialty electronic equipment ordered for the Chevrolet Blazer either was installed in the Suburban instead or was later transferred from the Blazer to the Suburban. More importantly, perhaps, it would have required the jury to consider the evidence concerning the Blazer solely for its exculpatory worth vis-à-vis Exhibit 14B and to ignore the inculpatory inferences that could be drawn from the facts surrounding the Blazer. This was the second incident in which someone

had broken into one of the Jacksons' automobiles following an accident, and it was the fourth incident in which the Jacksons were seeking reimbursement for expensive electronic equipment that purportedly had been stolen from or along with their vehicle. A jury possibly could have thought that the Jacksons, having had four vehicles stolen or broken into within a three-year period, were among the most unlucky automobile owners in South Bend; but the jury might also have concluded that this fourth incident bore too many similarities to the other three to be coincidental. Indeed, after the defense had briefly raised the Blazer in cross-examining Prenkert at trial, the government itself had sought leave to introduce evidence concerning the 1995 Blazer as further proof of the fraudulent scheme, which the district court had disallowed. The court might well have reconsidered that ruling and allowed all of the details concerning the collision and break-in into evidence if the defense had more fully developed the theory that the electronic equipment stolen from the 1999 GMC Suburban originally had been purchased by Gates for the 1995 Chevrolet Blazer. It is far from clear that this would have been a net gain for Joe Jackson's defense.

## III.

For the foregoing reasons, we find the evidence sufficient to support the convictions of Essie and Joe Jackson and discern no error that required a new trial. We therefore AFFIRM their convictions.